585 A.2d 916

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
WALTER EDWARD OGLESBY,
DEFENDANT–APPELLANT.

Argued September 11, 1990—Decided January 23, 1991.

*Jacqueline E. Turner* and *Daniel A. Warshawsky,* Assistant Deputy Public Defenders, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney; *Jacqueline E. Turner, Daniel A. Warshawsky, Matthew Astore,* Deputy Public Defender II, and *Joseph A. Carmen,* on the briefs).

*Richard W. Berg,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Richard W. Berg* and *Donald S. Burak,* Deputy Attorney General, of counsel and on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

Defendant, Walter Oglesby, was convicted of capital murder and sentenced to death. He appeals as of right. *R.* 2:2–1(a)(3). At trial, defendant did not dispute that he had killed the victim. Instead he relied on the affirmative defense of insanity. *N.J. S.A.* 2C:4–1. In its jury instructions, the court charged not only on that defense, but also on diminished capacity. *N.J.S.A.* 2C:4–2. The charge, however, placed on defendant the burden of establishing by a preponderance of the evidence that he suffered from a mental disease or defect at the time of the homicide. This instruction impermissibly relieved the State of part of its burden of proving that the homicide was knowing or purposeful. Because of that error, defendant's conviction must be reversed.

–I–

Although the State acknowledges that the diminished-capacity charge was erroneous, it claims that the error was harmless because the defendant did not establish his claim of diminished capacity by sufficient evidence to justify such a charge. Our factual recitation, therefore, focuses on the evidence relevant to Oglesby's mental state at the time of the homicide.

Oglesby sustained brain injuries in an automobile accident when he was sixteen. As a result of that accident, he was unconscious for three days and hospitalized for over a month. From that time, according to his family, he was violent, self-destructive, and suffered from hallucinations.

At trial, his sister recalled an incident in 1979, after the auto accident, when Oglesby took her son for a walk, disappeared for seven or eight hours, and returned in a confused state, claiming that he had talked to Jesus and Mary. His brother and sisters testified that he had been hospitalized several times for mental illness in the 1970s and 80s.

Their testimony tended to establish the following additional facts concerning Oglesby's mental state. In 1981, he was

struck by a truck, necessitating the amputation of one of his legs. With part of the settlement proceeds, he purchased a new Lincoln. Soon, however, he said he could not ride in the car because it was inhabited by a phantom named "Boyaz." Fearful of Boyaz, Oglesby gave the car to his brother and purchased another new Lincoln for himself. Over the years, down to the time of the homicide, Boyaz frequently appeared to defendant and instructed him on the mysteries of death.

Oglesby also engaged in other forms of bizarre conduct. In 1983, in a possible suicide attempt, he drove his car over a cliff, and told investigating police that he had been "going home to God." On other occasions, while visiting his sister, who owned no farm animals, he would sit, stare, and describe non-existent cows in her backyard. He insisted that she owned "the biggest cows" and, when she asked him to describe them, stated that they had "lots of legs."

In 1983, Oglesby's family committed him to the Georgia Mental Health Institution for five days. Although Oglesby did not stay at the hospital long enough for a final diagnosis, the tentative diagnosis was schizophreniform disorder, a short-term form of schizophrenia.

On the critical issue of defendant's sanity, the defense and prosecution psychiatrists differed sharply. The State psychiatrist, Dr. Weiss, testified that defendant was competent to stand trial, a conclusion that was accepted by the trial court, and that Oglesby was sane at least when Dr. Weiss examined him. He suggested defendant's mental problems, if any, were temporary and episodic. Defendant's psychiatrist, Dr. Rushton, disagreed. He testified both that defendant was incompetent to stand trial and that for fifteen years he had been a paranoid schizophrenic. In Dr. Rushton's opinion, Oglesby could not distinguish right from wrong at the time of the murder and was legally insane at the time of trial.

Defendant's mental and emotional deterioration throughout the early 1980s was reflected in his stormy relationship with

the victim, Muriel Russell. During that relationship, which lasted for approximately eight years, Russell gave birth to their son. In 1982, Oglesby moved to Georgia, and in 1983 convinced Russell to join him. In 1984, she left him three times to return to New Jersey. The first two times Oglesby convinced her to return to Georgia. Russell left the third and final time in August 1984. A few days later, Oglesby followed Russell to New Jersey, where he joined her.

On September 27, 1984, they checked into the Hillside Motor Lodge in Cherry Hill, to which they returned on the night of September 28. The following morning a housekeeper discovered Russell's corpse. Russell had been hacked and stabbed to death. Oglesby was gone. Police investigation revealed that Oglesby registered at a motel in College Park, Maryland at 12:30 a.m. on September 30.

The Camden police arrested defendant outside his mother's home on October 1, 1984. He claimed that he was innocent and that he had just returned from Europe.

In 1984, a Camden County grand jury indicted Oglesby for capital murder, N.J.S.A. 2C:11-3a(1) or -3a(2); possession of weapons for an unlawful purpose, N.J.S.A. 2C:39-4d; possession of weapons under circumstances not manifestly appropriate, N.J.S.A. 2C:39-5d; and two counts of hindering apprehension, N.J.S.A. 2C:29-3b(1). The jury convicted defendant on all counts.

In the penalty phase, the jury found one aggravating factor, that the murder was outrageously or wantonly vile, horrible, or inhuman, N.J.S.A. 2C:11-3c(4)(c) ("aggravating factor c(4)(c)"), and two mitigating factors, that the defendant had no significant history of prior criminal activity, N.J.S.A. 2C:11-3c(5)(g), and that defendant had been under the influence of extreme mental or emotional disturbance, N.J.S.A. 2C:11-3c(5)(e). The jury further found that the aggravating factor outweighed the mitigating factors beyond a reasonable doubt, thereby finding that death was the appropriate penalty.

## –II–

■ At the conclusion of the guilt phase, the court's charge included instructions on the issue of defendant's diminished capacity. Parts of the charge properly placed on the State the burden of proving each element of the offense beyond a reasonable doubt. The diminished-capacity part, however, improperly required defendant to prove a mental disease or defect by a preponderance of the evidence. As we have now instructed trial courts, the State always bears the burden of proving beyond a reasonable doubt the culpable mental state, and the defendant need not prove by a preponderance of the evidence the alleged mental disease or defect. *State v. Moore*, 122 *N.J.* 420, 425–27, 585 *A.*2d 864, 866–67 (1991).

In *Moore*, we reviewed the issue of diminished capacity. We would serve no useful purpose by again reviewing it here. Neither need we revisit the history of mental states as outlined in *State v. Breakiron*, 108 *N.J.* 591, 532 *A.*2d 199 (1987). In *Moore*, we described our attempt in *Breakiron* to construe *N.J.S.A.* 2C:4-2, which defines diminished capacity, to accommodate due-process concerns; the Third Circuit's conclusion that the statute was beyond salvation, *Humanik v. Beyer*, 871 *F.*2d 432, 442–43 (1989); the Chief Justice's directive to the trial courts to follow *Humanik*, see 124 *N.J.L.J.* 1562 (Dec. 28, 1989) (summarizing the directive); and the 1990 statutory amendment removing the preponderance-of-the-evidence burden from defendants, *L.* 1990, *c.* 63. See *Moore, supra*, 122 *N.J.* at 431–34, 585 *A.*2d at 869–71.

In this tragic case, we do not break any new ground. The outcome is controlled by the now-settled principle that if there is any evidence that defendant suffered from a mental disease or defect that might affect his ability to form an intent to kill, the State must prove beyond a reasonable doubt that such disease or defect did not prevent defendant from acting with the requisite mental state. See *N.J.S.A.* 2C:1–13a.

At the time of the trial, *N.J.S.A.* 2C:4–2, the statute pertaining to the "defense" of diminished capacity, provided:

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.

In its charge, the court began by explaining the State's general burden to prove defendant's guilt beyond a reasonable doubt:

This defendant, as are all defendants in criminal cases, is presumed to be innocent until proven guilty beyond a reasonable doubt. * * * The burden of proof is on the State and it never shifts, it remains on the State throughout the entire trial of the case. No burden with respect to proof is imposed on the defendant, he is not obliged to prove his innocence. Unless the State proves the crimes charged beyond a reasonable doubt, the defendant is assumed to be innocent and is entitled to be acquitted.

The part of the charge specifically concerned with defendant's mental state contradicted that general explanation by placing on defendant the burden of proving his diminished capacity:

Now, apart from his general denial of guilt, the defendant maintains that he is not guilty because of the existence of a mental disease or defect which precluded him from forming the requisite mental state of acting with purpose or purposely. * * *

    *       *       *       *       *       *       *       *

Mental disease or defect is an affirmative defense, and the burden of proving by a preponderance of the evidence is upon the defendant who asserts that defense. * * *

If you find the State has proved all the elements of each of the crimes and the defendant's participation in those crimes beyond a reasonable [doubt] and if you also find that the defendant had established the affirmative defense of mental disease or defect by a preponderance of the credible evidence, your verdict would be not guilty. If on the other hand, you find that the State has proved beyond a reasonable doubt all of the essential elements of each of the crimes and the defendant's participation in those crimes and you also find that the State has disproved beyond a reasonable doubt this defense of mental disease or defect, then you must find the defendant guilty.

Taken together, these two portions of the instructions could have misled the jury to believing that defendant had the

burden of proving his diminished capacity. Although the instructions began correctly by placing on the State the burden of proving beyond a reasonable doubt each element of the offense, including defendant's mental state, the diminished-capacity instruction relieved the State of part of that burden by requiring defendant to prove a mental disease or defect by a preponderance of the evidence. The jury could have found that the evidence raised a reasonable doubt whether Oglesby had the requisite mental state at the time of the homicide, but that defendant was guilty because he had not proved the existence of a mental disease or defect by a preponderance of the evidence. That possibility requires the reversal of Oglesby's conviction. As we recently stated, "[c]ontradictory and inconsistent charges are inherently inadequate as they 'create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner....'" *Moore, supra,* 122 *N.J.* at 433, 585 *A.*2d at 870 (quoting *Humanik, supra,* 871 *F.*2d at 442 (quoting *Francis v. Franklin,* 471 *U.S.* 307, 323 n. 8, 105 *S.Ct.* 1965, 1976 n. 8, 85 *L.Ed.*2d 344, 359 n. 8 (1985))).

The State recognizes that the charge was flawed, but now argues that the error was harmless for two reasons. First, the State contends the challenged instructions did not have the capacity to prevent the jury from considering relevant evidence on the issue of defendant's mental state. Essentially, the State is arguing that the defects in the instruction were not so substantial as to have affected the jury's verdict. We disagree.

As the preceding discussion reveals, the charge was defective because it could have confused the jurors about the State's burden of proving beyond a reasonable doubt that defendant acted knowingly or purposefully. A defect on so critical a point clearly had the capacity of producing an unjust result. *See R.* 2:10–2.

Second, the State argues that even if the instruction had been correct, there was insufficient evidence of a mental disease or defect for a jury to have a reasonable doubt that defendant had

the requisite mental state for knowing or purposeful murder. Again, we disagree.

Our review of the record in the present case leads us to conclude that the evidence of diminished capacity was sufficient to require a charge on diminished capacity. When, as here, defendant did not request an instruction on diminished capacity, the test is whether the facts clearly indicate that a diminished-capacity charge is appropriate. *State v. Pitts,* 116 *N.J.* 580, 607–10, 562 *A.*2d 1320 (1989); *State v. Choice,* 98 *N.J.* 295, 299, 486 *A.*2d 833 (1985). Our review, consistent with the decision of the trial court, satisfies us that the evidence meets that test.

Much of the evidence at trial tended to prove that defendant suffered from a diminished capacity within the meaning of *N.J.S.A.* 2C:4–2. A jury could have found that from the time defendant suffered brain injury at the age of sixteen, his life was a chronicle of mental illness. Defendant's history reveals that he was institutionalized numerous times, suffered from hallucinations, sustained serious bodily injuries in two motor vehicle accidents—one a head injury and one resulting in the amputation of one of his legs—and was diagnosed as suffering from a form of schizophrenia.

Other evidence also supports the conclusion that on the night of the homicide, Oglesby, even if sane, was suffering from a mental disease or defect. In the weeks before Russell's death, Oglesby destroyed the apartment that he shared with her, talked with Boyaz, and according to his brother and sister, otherwise acted "spacy." Shortly before Oglesby left Georgia in August, defendant's sister became so concerned about his behavior that she obtained a peace warrant for his own protection. His father, however, raised sufficient bail for defendant's release.

Defendant's conduct on the evening of September 28 was ambivalent. At Church's Chicken restaurant, where defendant and Muriel went to eat, a counter clerk recalls that Oglesby was "just a little bit mad because he couldn't figure out what

he wanted." The operator of a tow truck, whom Muriel called on the restaurant's telephone when defendant's car became stuck in mud, recounted a dispute with defendant over the payment for towing defendant's truck.

When examining defendant after the homicide, Dr. Rushton injected him with sodium amytal, a drug that the doctor explained helps remove "an emotional block" to memory. In that examination, Oglesby related that the murder victim had attacked him and that "she walked into the fire." Such evidence of defendant's mental disease or defect, in conjunction with Oglesby's history of mental illness and Dr. Rushton's testimony that Oglesby "has been insane for about 15 years according to the history," clearly justified a charge on diminished capacity.

We conclude that the trial court did not err by delivering on its own motion a charge on diminished capacity. The charge, however, was defective and had the capacity to produce an unjust result. Consequently, it constituted plain error. *R.* 2:10–2. As we have previously stated, "erroneous instructions on material issues are presumed to be reversible error, excusable only if they are harmless beyond a reasonable doubt." *State v. Crisantos (Arriagas),* 102 *N.J.* 265, 273, 508 *A.*2d 167 (1986). That presumption is particularly appropriate when, as in this case, defendant's mental state was the critical issue at trial.

–III–

■ Even in the absence of a defective diminished-capacity charge, we would be compelled to vacate the imposition of the death sentence. The reason is that the charge concerning aggravating factor c(4)(c), the sole basis for the imposition of the death penalty, was constitutionally deficient. That conclusion follows from the failure of the charge to comply with our subsequent decision in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987). See also *State v. McDougald,* 120 *N.J.* 523, 566, 577 *A.*2d 419 (1990) (listing cases that have applied our

holding in *Ramseur* concerning c(4)(c)). In *Ramseur*, we narrowed the meaning of aggravating factor c(4)(c) to remedy a constitutional defect in its statutory definition.

As we stated in *Ramseur*, without a narrowing construction, section c(4)(c) does "not pass constitutional muster * * *." 106 *N.J.* at 200, 524 *A.*2d 188. For this reason, we advised trial courts not to quote the statutory language in their jury instructions. *Id.* at 211, 524 *A.*2d 188. Finding that "the essence of the legislative concern [in section c(4)(c)] is the defendant's state of mind," *id.* at 207, 524 *A.*2d 188, we explained that either of two states of mind was necessary to establish the factor: (1) the intent to "cause extreme physical or mental suffering," when the defendant's conduct causes extreme suffering by the victim, *id.* at 208, 524 *A.*2d 188; or (2) the intent to kill for "no purpose * * * beyond [the defendant's] pleasure of killing," *id.* at 211, 524 *A.*2d 188. Without such a limiting instruction, section c(4)(c) "permits juries to find the existence of the aggravating factor in an arbitrary and capricious manner, and therefore fails to assure the 'channeling' of the jury's discretion required by [the United States Supreme Court] * * *." *Id.* at 197, 524 *A.*2d 188.

Section c(4)(c) provides in relevant part:

(4) The aggravating factors which may be found by the jury or the court are:

    *       *       *       *       *       *       *       *

(c) The murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim.

Virtually tracking the statute, the court charged:

The State has alleged that the following aggravating factor is present in this case, and that is, "That the murder of Muriel Russell was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

    *       *       *       *       *       *       *       *

Insofar as the aggravating factor which I have mentioned, although every murder may be viewed as vile, horrible or inhuman, this does not mean that there is an automatic aggravating factor in every case of murder. What is necessary is that the State prove the attack by the defendant, Mr. Oglesby, on

the victim, Muriel Russell, involved either torture or conduct indicating a depraved mind or that the attack was so savagely brutal or outrageously cruel and violent that the adjectives wantonly vile or horrible or inhuman are justified.

The instructions, which did not comply with any of *Ramseur*'s requirements, thus provide an independent ground for vacating Oglesby's death sentence.

–IV–

Because we reverse Oglesby's conviction and sentence for the reasons given in Parts II and III, we do not discuss his claim of insufficiency of counsel. Nor do we discuss his other claims of error, none of which was raised at trial. We limit our discussion to those issues on which further guidance might be helpful on retrial.

## A. GUILT PHASE

### 1. *Defendant's Right to Remain Silent and Right to Counsel*

■ Defendant argues that the prosecutor unconstitutionally penalized him for exercising his right to counsel and his right to remain silent by repeatedly referring to defendant's silence as evidence of his sanity. On the State's case, the prosecutor elicited testimony from the arresting and investigating police officers that after they had administered *Miranda* warnings, defendant invoked his right to counsel on several occasions. During cross-examination of Oglesby's psychiatrist, moreover, the prosecutor asked whether Oglesby's invocation of that right demonstrated defendant's sanity. Again, during his summation, the prosecutor argued that Oglesby's silence evidenced his sanity. For instance, at one point, the prosecutor argued:

> Can there be any better example of [the defendant's] rationality and state of mind, of his appreciating right from wrong, that when he gets to the crucial issue, * * * that is when he said, "I know I have rights because I gave them up and I know I have rights because I take them back at this time.

We don't offer that to you in any way to comment upon whether or not that is an improper thing to do. * * * It's only offered to you to show his state of mind, his ability to choose intelligently and exercise those rights.

In *Wainwright v. Greenfield,* the United States Supreme Court held that under the fourteenth amendment of the United States Constitution it is "fundamentally unfair for [a] prosecutor to [use defendant's] post-arrest, post-*Miranda* warnings silence as evidence of his sanity." 474 *U.S.* 284, 295, 106 *S.Ct.* 634, 641, 88 *L.Ed.*2d 623, 632 (1986). Here, the prosecutor's attempt to disparage defendant's insanity defense by referring to the invocation of his right to silence and to an attorney contravened that holding. On remand, the prosecutor must not suggest explicitly or implicitly that defendant's silence evidenced his sanity at the time of the homicide.

### 2. *Failure to Charge Manslaughter*

Defendant also raises as plain error under *Rule* 2:10–2 that the trial court erred by failing to charge the lesser-included offenses of aggravated manslaughter, *N.J.S.A.* 2C:11–4c; reckless manslaughter, *N.J.S.A.* 2C:11–4b(1); and passion/provocation manslaughter, *N.J.S.A.* 2C:11–4b(2).

The question is whether defendant was entitled to a charge on any form of manslaughter. On this record, the evidence supporting any manslaughter charge is sparse. The victim, who had been hacked and stabbed fifty times with three knives, died of bleeding from multiple stab wounds. Aggravated and reckless manslaughter each require proof of recklessness. Given the absence of evidence that the killing was anything less than knowing or purposeful, we cannot say that the trial court committed plain error by failing to charge either aggravated or reckless manslaughter. See *R.* 2:10–2. As we have previously explained, the mere fact that a court charges on diminished capacity in a murder case does not automatically require an instruction on either form of manslaughter. *See Ramseur, supra,* 106 *N.J.* at 269, 524 *A.*2d 188.

■ The evidence on passion/provocation manslaughter likewise is slim. Controverted evidence suggests that the victim struck Oglesby before he killed her. By itself, this evidence falls short of adequate provocation. As we have repeatedly stated, the test for adequate provocation is provocation sufficient to arouse the passions of an ordinary person beyond the power of his or her control. *State v. Mauricio,* 117 *N.J.* 402, 412, 568 *A.*2d 879 (1990). In addition, we have observed that "[t]he offense is not manslaughter but murder where the defendant alone was armed * * *." *Crisantos (Arriagas), supra,* 102 *N.J.* at 274, 508 *A.*2d 167 (quoting 1 O. Warren and B. Bilas, *Warren on Homicide* § 110 at 525–26 (Perm.Ed.1938)). On the record before us, even if Russell struck Oglesby, we cannot hold that the jury should have been allowed to find that a single blow by an unarmed woman could have aroused the passions of an ordinary man beyond the power of his control.

It may be, as defendant's counsel argues, that on remand defendant will develop a more compelling record for a manslaughter charge. Given the inscrutability of mental states, *State v. Worlock,* 117 *N.J.* 596, 606, 569 *A.*2d 1314 (1990), a better record might support not only a charge on diminished capacity as a "defense" to a knowing or purposeful crime, but also a charge on one form of manslaughter or another. On the record before us, however, we do not find that the failure to charge manslaughter constituted plain error.

## B. PENALTY PHASE

Defendant also urges as a matter of plain error several errors concerning jury instructions in the penalty phase that do not conform to our subsequent holdings. Given our reversal of defendant's conviction and the imposition of the death penalty, we need not dwell on those points. If, on remand, there should be a new penalty-phase hearing, the trial court should conform its instructions to our intervening holdings.

–V–

We reverse defendant's conviction for murder, vacate the imposition of the death penalty, and remand the matter to the Law Division.

HANDLER, J., concurring.

The Court reverses the capital-murder conviction and death sentence of defendant, Walter Oglesby. It bases its reversal of the conviction primarily on the mishandling of the diminished-capacity defense. *Ante* at 528–532, 585 *A.*2d at 919–921. It reverses the death sentence because the trial court charge during the penalty phase, most notably that involving the c(4)(c) aggravating factor, was seriously flawed. *Ante* at 532–534, 585 *A.*2d at 921–922.

I concur in those reasons for the reversals. The Court discusses other issues only briefly, *i.e.,* defendant's right to remain silent and right to counsel, the failure to charge manslaughter, and penalty-phase instructions. *Ante* at 534–537, 585 *A.*2d at 922–924. Although I do not entirely subscribe to the Court's analysis and disposition of those issues, I see no need to elaborate on my differences except as they implicate another, more significant issue, namely, effective assistance of counsel. Nor do I find it necessary to explain further any differences that I may have with the Court with respect to the constitutionality of the capital-murder law, or to assert again grounds that, in my view, invalidate the capital-murder law. *See, e.g., State v. Di Frisco,* 118 *N.J.* 253, 284, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part). Nevertheless, the Court ignores one issue in particular, defendant's constitutional entitlement to effective assistance of counsel. *Ante* at 534, 585 *A.*2d at 922. That issue deserves attention.

Defense counsel was a single practitioner, without any experience in capital cases and without any aid or resources to bolster him in his representation. The record discloses many serious shortcomings in the trial, many of them attributable to the performance of defense counsel. For example, defense

counsel failed to assure an adequate *voir dire* of the jury or, at best, acquiesced in a *voir dire* that was only minimally adequate. In addition, counsel failed to object at trial to the prosecutor's repeated and extensive references to defendant's exercise of his *Miranda* rights as constituting evidence of his sanity. Defense counsel also failed to request that the lesser-included offenses of reckless and passion/provocation manslaughter be submitted to the jury. Indeed, in large part because of counsel's problematic performance, twenty-one out of twenty-two issues on appeal were not raised below.

The case thus poses the question whether defense counsel's performance was so deficient as to justify a reversal of the capital-murder conviction and death sentence. That, in turn, requires us to address and, I submit, reexamine our current rule governing effective assistance of counsel in capital-murder prosecutions.

The current rule originated with *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). *Strickland* announced a two-pronged test, which we adopted with slight modification in *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987). We have since decided that that test is to be applied to capital-murder cases. *State v. Davis,* 116 *N.J.* 341, 561 *A.*2d 1082 (1989). The test requires, first, that the defendant establish that counsel's performance was deficient as measured by an objective standard of reasonableness under "prevailing professional norms." *Strickland, supra,* 466 *U.S.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. The defendant must overcome a presumption that counsel engaged in "the exercise of reasonable professional judgment." *Ibid.* Second, the defendant must, in the majority of circumstances, show that he or she was prejudiced by counsel's errors and that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

The test is one that is likely to demonstrate ineffective assistance of counsel in only the most egregious cases. Thus, in *State v. Savage*, 120 *N.J.* 594, 577 *A.*2d 455 (1990), the Court concluded that the defendant had not received effective assistance of counsel. However, there the defense attorney met with his client only once, failed to explore or present an insanity defense under circumstances clearly indicating the plausibility of such a defense, and even introduced evidence that prejudiced his client. Here, the circumstances surrounding counsel's performance are not nearly as extreme as those in *Savage*. Defendant's attorney met with his client, prepared an insanity defense, and presented an expert witness to attest to his client's insanity. Nevertheless, trial counsel committed professional errors that, when taken together, present a picture of an attorney ill-prepared to handle the defense of a capital-murder prosecution, perhaps overwhelmed with the task of representing a client who had hacked and stabbed his lover and left her to bleed to death.

In *State v. Davis, supra,* the Court found that counsel's good intentions and conscientious efforts on behalf of his client were sufficient to establish reasonable competence. 116 *N.J.* at 359–60, 561 *A.*2d 1082. Counsel in this case obviously was conscientious in his representation of defendant. He continued to represent defendant even after his health faltered and after defendant had run out of funds to pay him. In addition, even if the attorney was ineffective, it is arguable that the outcome at trial would not have been different had defendant had ordinarily-competent counsel. As in *Davis*, however, such an analysis does not come close to dealing with the standards defining counsel's professional responsibilities, let alone the level of competence that should be brought to bear when a client's life is at stake. *State v. Davis, supra,* 116 *N.J.* at 402–03, 561 *A.*2d 1082 (Handler, J., concurring in part and dissenting in part).

It may be assumed that the Court remains confident that the standard endorsed in *Davis* will assure the levels of professional representation demanded in capital proceedings. That confi-

dence is ill-founded. Certainly the professional challenges in this case differed fundamentally from those presented in an ordinary criminal case. The task confronting counsel involved numerous complexities, substantive and procedural, that are posed in virtually all death-penalty trials. Such complexities attend the indictment, pretrial events, and jury selection, and continue through two sequential trials that have distinctively different functions, yet are predicated on overlapping evidence. As in *Savage*, in this case counsel's inexperience and ineptitude with respect to the nuances of capital litigation are obvious. See *State v. Savage, supra,* 120 *N.J.* at 645, 577 *A.*2d 455 (Handler, J., concurring in part and dissenting in part).

The several glaring instances of incompetence here can be attributed in great part to counsel trying the case without any experience, special training, or focused preparation in the defense of capital cases, and without additional resources vital to the defense of a defendant charged with capital murder. Overall, counsel's trial performance fell well below that which would have been achieved by a highly skilled, experienced attorney with established expertise in capital trials.

The attorney here failed to file a single pretrial motion challenging any aspect of New Jersey's capital sentencing statute, even though defendant's trial predated this Court's validation of the State's death-penalty statute in *Ramseur* and *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987). Especially in light of the fact that so many aspects of the statute have been successfully attacked, it is astonishing that counsel raised no objection on behalf of his client challenging in any respect the constitutionality and validity of the death-penalty statute.

Further, counsel's professional representation in the course of jury qualification was grossly inadequate. Counsel did not submit questions for inclusion in the jury questionnaire. He failed to ask follow-up questions during *voir dire* concerning jurors' views on the death penalty or on psychiatry. See *State*

■■■■■■■■■■■■■■■

*v. Moore*, 122 *N.J.* 420, 454, 585 *A.*2d 864, 881 (1991) (*voir
dire* "should screen out prospective jurors who [cannot] consider an insanity defense due to their prejudices or biases against
it"). With respect to the qualification of individual jurors,
counsel failed to make any motions except one, namely, a
mistrial motion made after the jury had been chosen and based
generally on the inadequacy of the death-qualifying process.
Moreover, counsel displayed a grave misunderstanding of the
principles governing the death-qualification of jurors. He thus
asked that jury panels be pre-screened on the issue of the death
penalty to produce a jury composed of 50% of persons who
were in favor and 50% who were against the death penalty.[1]
Counsel's view of impartiality was not premised on each juror
being open-minded about whether to impose the death penalty
and capable of following the law. Thus, because of his misunderstanding of the requirements for death qualification, counsel
failed to object to jurors favoring the death penalty, with only a
word to the prosecutor that when it came time to qualify a
juror who stood against the death penalty, then the prosecutor
should show him the same deference. Counsel even appeared
hostile when the State asked follow up questions regarding
jurors' ability to impose the death penalty, apparently out of

---

[1]The motion produced this exchange:

   [COUNSEL]: I feel that the [death qualifying] system is defective in that
   the juror should be death-qualified in terms of their views on the death
   penalty prior to even coming in here, so that a panel could be generated
   that would have an equal number of people that are in favor of the death
   penalty and opposed, and that is the basis of my objection.
   THE COURT: Well, how would one do that?
   [COUNSEL]: How would one do that Judge, would be that if a capital case
   is going to be tried, then when the daily list of the jurors are made up,
   prior to the actual bringing in the panel to the courtroom, there should be
   some way that we would be able to ascertain their views on the death
   penalty, either by boxes they are in favor, opposed, or whatever ...
   THE COURT: So you are saying the Constitution requires that if there is a
   panel of 50, you should have 25 in favor of the death penalty and 25
   against the death penalty? ... I don't know of any authority for that
   proposition.

fear that the jurors would then feel pressed to impose the death penalty.

One cannot infer that counsel simply sought to prevent juror over-exposure to the death-penalty issue. Counsel may not waive death-qualification when defending a capital defendant. *Compare State v. Hunt*, 115 *N.J.* 330, 558 *A.*2d 1259 (1989) (some flexibility allowed counsel in death-qualification as long as ultimate jury qualification can be fairly determined). As noted, counsel here was singularly inept during the *voir dire*.

Jury impartiality is indispensable in capital cases. *Turner v. Murray*, 476 *U.S.* 28, 33–34, 106 *S.Ct.* 1683, 1686–1687, 90 *L.Ed.*2d 27, 35 (1986) (in capital cases the jury has broad discretion during the penalty phase, and the risk of improper sentencing is specially serious); *State v. Williams* II, 113 *N.J.* 393, 445, 550 *A.*2d 1172 (1988) ("No matter how convinced we may be of defendant's guilt, unless we are similarly convinced of the jury's impartiality, we cannot allow the death penalty to be imposed."); *State v. Williams* I, 93 *N.J.* 39, 60–61, 459 *A.*2d 641 (1983) ("the right of defendant to be tried by an impartial jury is of exceptional significance in cases in which the defendant faces death"). That impartiality requires thorough, comprehensive, and searching *voir dire*. See *Williams* II, *supra*, 113 *N.J.* at 409–10, 550 *A.*2d 1172. I do not believe the *voir dire* process met constitutional standards.

Defense counsel's lack of competence appears in other aspects of the trial. Counsel failed to object when the State elicited testimony regarding defendant's exercise of his *Miranda* rights. In *Wainwright v. Greenfield*, 474 *U.S.* 284, 106 *S.Ct.* 634, 88 *L.Ed.*2d 623 (1986), the Supreme Court held that the State could not use the fact that the defendant exercised his right to counsel and to remain silent after having been apprised of his *Miranda* rights in order to prove at trial that the defendant was sane or even to impeach the defendant's testimony. In this case the prosecutor repeatedly commented on defendant's request for counsel and his exercise of the right to

remain silent as evidence of defendant's sanity. Because defense counsel did not object to those references, the trial court issued no curative instructions to the jury.

Moreover, it appears that defense counsel failed to prepare defendant's psychologist adequately for trial. As a result, the witness appeared ignorant of the diminished-capacity statute and equivocated in his testimony. Nor did counsel request that the lesser-included offenses of manslaughter be charged to the jury. Additionally, counsel did not object to the trial court's charge on mitigating factors and on aggravating factor c(4)(c), nor did he request that the trial court tell the jury that its verdict need not be unanimous. Finally, on appeal and after substantial delay, trial defense counsel (who was eventually replaced by public defenders for the appeal) filed an inadequate twenty-two page brief that failed to address all but one of the issues now considered by this Court.

This case points up the patent insufficiency of the standards of professional competence required in a capital-murder prosecution. The basic test or definition of professional competence is that which is "reasonable" in terms of an average attorney or is measured by the "task to be accomplished." The Court's definitions do not provide adequate guidance. The unmanageability of the Court's standard is exemplified by the confusion and incoherence that witness its application. Thus, in this case, counsel's problematic representation equates with effective assistance of counsel because his level of competence is "average" or "ordinary." The Court's loose and permissive application of the test of attorney competence lends substance to Justice Marshall's objection to that performance standard: "[the standard] is so malleable that, in practice, it will either have no grip at all or will yield excessive variation in the manner in which the Sixth Amendment is interpreted and applied.... To tell lawyers and the lower courts that counsel for a criminal defendant must behave 'reasonably' and must act like 'a reasonably competent attorney' ... is to tell them almost nothing." *Strickland, supra,* 466 *U.S.* at 707–08, 104 *S.Ct.* at

2074–75, 80 *L.Ed.*2d at 706 (Marshall, J., dissenting) (citations omitted).

More importantly, the Court's standard for assessing attorney competence does not assure a sufficiently high level of attorney performance in the defense of a capital-murder prosecution. I believe the special considerations present in capital cases demand specialized competence on the part of counsel. Counsel in these cases must provide competence grounded in experience, training, and professional skill that will suffice to provide a defendant with the full measure of all the heightened protections a capital-murder prosecution engenders. *State v. Davis, supra,* 116 *N.J.* at 402, 561 *A.*2d 1082 (Handler, J., concurring in part and dissenting in part). The level of competence sufficient for general criminal defense work cannot satisfy the heightened fair-trial standards that apply to capital-murder prosecutions. Capital counsel must be held to an exacting standard of competence. *State v. Savage, supra,* 120 *N.J.* at 644, 577 *A.*2d 455 (Handler, J., concurring in part and dissenting in part). The American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases recognizes the distinction between capital and non-capital prosecutions:

> The quality of counsel's "guiding hand" in modern capital cases is crucial. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules, and be able to develop strategies applying them in the pressure-filled environment of high-stakes, complex litigation. [Commentary to Guideline 1.1.]

The extraordinary circumstances that magnify the difficulties of capital-murder prosecutions reasonably require, according to the ABA, no fewer than two highly-qualified attorneys be appointed to represent each capital defendant. Commentary to Guideline 2.1. *Id.* at 646, 577 *A.*2d 455. This is consistent with the policy of the New Jersey Public Defenders, who assign two attorneys to each capital defendant to assure adequate representation.

The substantial and numerous differences between capital and non-capital criminal prosecutions compel, as a matter of state constitutional law, the adoption of an enhanced standard

by which to measure the competence of counsel and the degree of prejudice sufficient to find a violation of the right to such assistance. In considering an enhanced standard by which to measure the performance of counsel and to determine whether such assistance is effective, we should recognize that counsel representing a defendant in a capital-murder prosecution must have more than average ability and skill in advocacy to apply in the defense of his client. Such aptitude must include special knowledge, expertise, training, and experience, not simply the skills of an average practitioner. In a given case, attorney competence must encompass careful and thorough preparation. Further, it cannot be overstressed that the demands placed on trial attorneys during a sentencing phase are unique; defense counsel must present to the jury a portrait of the defendant demonstrating his or her worthiness to remain alive. The crafting of such a humanizing presentation requires consultation between counsel and a defendant and exhaustive investigation in order to prepare a psychological defense. See *Burger v. Kemp*, 483 *U.S.* 776, 810, 107 *S.Ct.* 3114, 3134, 97 *L.Ed.*2d 638, 667, 671 (1987) (Blackmun, J., dissenting); *Strickland, supra*, 466 *U.S.* at 717–18, 104 *S.Ct.* at 2080–81, 80 *L.Ed.*2d at 712–13 (Marshall, J., dissenting); see also Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 *N.Y.U.L.Rev.* 299 (1983). In light of such demands, the Court can ill-afford to dismiss casually the problem of assessing attorney performance.

In sum, the profound and material differences between capital and non-capital criminal prosecutions demand, as a matter of state constitutional law, the adoption of an enhanced standard by which to measure the competence of counsel and the degree of prejudice sufficient to find a violation of the right to such assistance. That enhanced level of performance was not achieved in this case. It greatly exceeds that which suffices for an average attorney. Defendant did not have effective assistance of counsel.

*Concurring in result*—Justice HANDLER.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—None.