230 N.J. Super. 10 (1988)
552 A.2d 621
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROLAND SHERMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 26, 1988.
Decided December 6, 1988.
*11 Before Judges KING, BRODY and SKILLMAN.
Alfred A. Slocum, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).
Herbert H. Tate, Jr., Essex County Prosecutor, attorney for respondent (Elizabeth Miller-Hall, of counsel and on the brief).
The opinion of the court was delivered by BRODY, J.A.D.
A jury found defendant guilty of first-degree robbery, N.J.S.A. 2C:15-1, and second-degree aggravated assault of the robbery victim, N.J.S.A. 2C:12-1b(1). The judge merged the crimes and sentenced him to a 15-year prison term for the robbery, 6 years to be served without parole eligibility. We reverse and remand for a new trial because of excesses in the assistant prosecutor's summation.
Defendant raises the following points in his brief:
I. PROSECUTORIAL COMMENTS MADE DURING SUMMATION WERE IMPROPER AND DEPRIVED DEFENDANT OF A FAIR TRIAL (NOT RAISED BELOW).
(A) THE PROSECUTOR IMPROPERLY COMMENTED ON AND MISREPRESENTED DEFENSE COUNSEL'S ROLE IN A CRIMINAL TRIAL.
(B) THE PROSECUTOR IMPROPERLY REFERRED TO HIS OWN PERSONAL BELIEF AS TO THE GUILT OF THE DEFENDANT.
(C) THE PROSECUTOR MADE AN IMPROPER REFERENCE TO DEFENDANT'S FINANCIAL CONDITION AND TO THE VICTIM'S HOMOSEXUALITY AS MOTIVE TO COMMIT A CRIME.
II. IMPOSITION OF THE SIX YEAR PERIOD OF PAROLE INELIGIBILITY IS MANIFESTLY EXCESSIVE AND NOT SUPPORTED BY THE RECORD BELOW.
(A) THE COURT'S FINDINGS OF FACT ARE NOT SUPPORTED IN THE RECORD.
(B) THE SENTENCE IMPOSED IS SO SEVERE THAT IT SHOCKS THE JUDICIAL CONSCIENCE.
III. PRETRIAL EVIDENTIAL RULINGS BY THE TRIAL COURT CONSTITUTED AN ABUSE OF DISCRETION BECAUSE THEY WERE NOT *12 SUPPORTED ON SUFFICIENT CREDIBLE EVIDENCE IN THE RECORD BELOW.
(A) THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS BECAUSE SERGEANT WRIGHT DID NOT HAVE JUSTIFICATION TO STOP DEFENDANT IN THE FIRST INSTANCE AND THUS DID NOT HAVE THE RIGHT TO CONDUCT A PAT DOWN SEARCH OF DEFENDANT.
(B) TESTIMONY CONCERNING THE OUT OF COURT IDENTIFICATION OF DEFENDANT BY MARTINEZ AT THE POLICE STATION SHOULD HAVE BEEN EXCLUDED BY THE COURT.
(C) THE COURT ABUSED ITS DISCRETION BY DECIDING TO ADMIT EVIDENCE OF DEFENDANT'S PRIOR CONVICTION TO BE USED TO IMPEACH HIS CREDIBILITY.
We agree with the substance of defendant's first point, his second point is rendered moot by our remand, and we are satisfied from a careful review of this record that his third point is clearly without merit. R. 2:11-3(e)(2).
Defendant was tried with a co-defendant, Todd Barnes. According to the State's evidence, around 2:00 a.m. a police officer patroling in his car spotted defendant and Barnes running from a parking lot that served several businesses including a bar. After briefly losing sight of the men he again spotted them while they were walking together on the sidewalk. He noticed that defendant's face was bloody, his clothes disheveled and dirty, and his demeanor anxious and nervous. The officer stopped the men and patted them down. Defendant had what appeared to be a handgun in his pants pocket. It was a starter's cap pistol.
The officer left defendant and Barnes with other officers whom he had previously summoned, and headed toward the bar. On the way, he was approached by someone who told him that a patron of the bar had been assaulted in the parking lot during an attempted armed robbery. The officer met the victim at the bar and drove him to where the other officers were holding defendant and Barnes. Though distraught, the victim recognized both men, identifying defendant as the man who had just assaulted and tried to rob him at gunpoint.
The victim identified the men again at police headquarters and at trial. He testified that he fought with defendant in the *13 parking lot for 10 to 20 minutes, calling aloud for help, before defendant and Barnes, who had been standing nearby observing it all, ran away together. He directed the jury's attention to a scar on defendant's arm located where he had bitten him during the fight. The victim also identified the gun that the police found in defendant's pocket as the gun defendant used in the robbery attempt.
Defendant rested at trial without presenting evidence. Barnes testified that he and defendant lived near each other in the neighborhood where the robbery occurred. A short time before being arrested, they met by chance in front of a tavern. Barnes bought a quart of beer in the tavern and shared it with defendant while they were walking home. When they reached their neighborhood defendant told Barnes that he wanted to telephone his wife, and he entered a public telephone booth on the corner.
While defendant was making the call, Barnes withdrew to an area between two buildings because he did not want to be seen drinking beer on a public sidewalk. After about five minutes, during which he was unable to see defendant, Barnes decided to go home. Leaving behind the partially full bottle of beer, he walked toward the telephone booth to tell defendant of his decision. As he approached the booth he saw defendant walking toward him. The officer stopped them as they converged. Barnes denied having any knowledge of the robbery and assault. The jury did not believe his story and found him guilty of armed robbery and simple assault.
Barnes's attorney put up an aggressive defense that attacked the victim's ability to identify Barnes, and attempted to provide corroboration of Barnes's testimony that he was not at the scene of the crimes. The attorney's main weapons were ten photographs that Barnes himself had taken of different parts of the parking lot where the crimes had occurred and of the immediate vicinity. The attorney attacked the victim's credibility by using the photographs to demonstrate inaccuracies in a *14 sketch of the crime scene that he previously had asked the victim to draw. In an attempt to corroborate his own testimony, Barnes testified that he took photographs of so many different areas because, not having been on the scene, he did not know where the crimes had taken place.
These tactics aggravated the assistant prosecutor. Out of the presence of the jury, he strenuously objected to the photographs because Barnes's attorney had not furnished them in discovery. He viewed as a waste and a distraction the considerable time Barnes's attorney took having witnesses describe what each photograph depicted. He believed that Barnes's attorney was harassing the victim with prolonged cross-examination concerning what he believed were irrelevant distances and sightlines. The assistant prosecutor's anger and frustration with the attorney's tactics erupted during his summation.
On the other hand Barnes's attorney was upset by a line of questioning that the assistant prosecutor undertook in cross-examining his client. The assistant prosecutor drew testimony from Barnes that as a resident of the neighborhood he knew that homosexuals frequented the bar where the crimes occurred. Barnes at one point called the patrons "funny" and the assistant prosecutor returned to that word several times in his questioning. Although Barnes's attorney did not object to this line of questioning, his anger and frustration with it erupted during his summation. The assistant prosecutor argued in his summation that the evidence proved that the defendants intentionally preyed on a patron of the bar in the belief that homosexuals would more easily be intimidated.
In his summation, Barnes's attorney made the point that the assistant prosecutor objected to the admission of the photographs because they were damaging to the State's case:
That's what the fight about these photographs has been all about throughout this trial. It's what the Prosecutor doesn't want you to see. The person who objects is the person who doesn't want the Jury to hear it or see it or consider it, not the person who offers it.
This comment was unfair for two reasons. First, an attorney should not be criticized for objecting to the admission of evidence *15 that is arguably inadmissible. Second, the assistant prosecutor's objections to the photographs were made outside the presence of the jury and were therefore beyond the scope of proper comment on what was before the jury.
As to the assistant prosecutor's questions about the bar's catering to homosexuals, Barnes's attorney said in his summation:
This case was going to be tried on the facts and the law, and not on some vile aspersions as to a person's habits, their friends and where they go. The Prosecutor's pursuit of that in that manner against his own witness was, I submit, from my point of view, reprehensible, and I submit had [the victim] been in this courtroom, he would have offered no thanks to the Prosecutor for having his case presented to you in that manner in this courtroom before a jury.
He concluded his summation on the same subject:
I submit the Prosecutor had no hesitancy whatsoever to embarrass his own witness once that witness left this courtroom, and I submit that intent to lure Todd into some show of disdain for whatever characteristics might be made about the people who are patrons at [the bar] has failed, and his unwillingness, even in the face of those terrible charges, to enter into that dialogue with the Prosecutor goes to further show that Todd Barnes has good character and perhaps the Prosecutor does not.
Although this brief ad hominem attack against the assistant prosecutor's character was inexcusable, the assistant prosecutor's response was so out of proportion to the provocation as to warrant a reversal of this conviction despite the strong evidence of defendant's guilt.
The assistant prosecutor began his summation with an explanation for what he was about to say:
... I have to confess to you now that I'm a little bit torn from what I originally intended to say, and I'm not ashamed to tell you the reason for that is that, because I came here to this court and did my job, did what I swore an oath to do, which is present witnesses, evidence and testimony as the Rules hold every attorney to, in an effort to bring about justice, because I did my job, another member of my profession has to stand in this court and attack my character.
Instead of properly discussing the evidence as he apparently had planned, the assistant prosecutor immediately blamed Barnes's attorney for the length of the trial "because it was dragged out on cross-examination." He charged that the attorney "tortured [the victim] on that witness stand for a day and a *16 half on cross-examination." He then attacked the attorney from another angle asking, "Why did [Barnes's attorney] tell you I objected to the photographs coming into evidence when that didn't happen."
Caught up in his rhetoric, the assistant prosecutor expanded his target to include defendant's attorney:
For the life of me, I've sat through this trial and summations and asked myself what are the defenses here, what's going to be the defense theory, what are they going to tell the Jury happened on that night. Well, you know now they're not going to tell you what happened on that night, because, if they did, their clients would be convicted, so they're going to try to use certain courtroom maneuvers to work on you.
The first defense is the defense of confusion, let's confuse the Jury....
The comment improperly casts on the defendants the burden of presenting evidence and could reasonably be understood as a comment on defendant's election not to testify. The comment also improperly accuses both defense attorneys of concealing their clients' guilt through deception. An attorney is not free to indulge "in unjustified aspersions on defense counsel's motives." Henker v. Preybylowski, 216 N.J. Super. 513, 519 (App. Div. 1987), quoting Tabor v. O'Grady, 59 N.J. Super. 330, 340 (App.Div. 1960).
Continuing in the same vein, the assistant prosecutor charged both defense attorneys with defending clients who they know are guilty:
The name of this case is State versus Roland Sherman and Todd Barnes. They did it, and they're guilty, and nothing that a lawyer can say standing up here with books and diagrams and pictures can change that, and they know it.
By criticizing the defense attorneys for defending clients who they know are guilty, the assistant prosecutor presented the jury with the spectacle of a figure of authority distorting and demeaning the role of a defense attorney. See State v. Thornton, 38 N.J. 380, 397 (1962), cert. den., 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963). Furthermore, the assistant prosecutor's pronouncement of the defendant's guilt was an unwarranted expression of his personal belief or opinion detached from references to specific evidence. See State v. Rose, 112 N.J. 454, 518-519 (1988).
*17 In another veiled comment on defendant's election not to testify, the assistant prosecutor commented:
Ladies and gentlemen, Todd Barnes did you no favor when he testified. Todd Barnes had to testify.
The assistant prosecutor was unsuccessful during trial in his repeated efforts to prove that Barnes's attorney had inspired and engineered Barnes's photographic efforts. Nevertheless, he told the jury:
Here's an individual who went out to the scene of the crime, took pictures of where he was upon recommendation of his attorney, although he wouldn't tell us where his attorney told him to stand when he took those pictures.
It is hard to believe that the assistant prosecutor was unaware that he was misrepresenting the evidence.
In a temporary respite from his attacks on defense counsel, the assistant prosecutor improperly commented on defendant's lack of funds as a motive for the crime:
... [Barnes] may have bought Roland Sherman the beer, because maybe Roland Sherman was broke, maybe didn't have any money. Maybe he needed money or a way to get money.
An assistant prosecutor may not suggest that a defendant's need for funds motivated his commission of a larceny offense. State v. Mathis, 47 N.J. 455, 469-472 (1966); State v. Stewart, 162 N.J. Super. 96, 100 (App.Div. 1978).
Returning to his personal attack on the defense attorneys, the assistant prosecutor accused his adversaries of conducting an unfair trial:
What is a trial if it's not fair? That's what [defense counsel] spoke about for an hour. Well, is it fair for [the victim] who's threatened, who thinks he's going to die, to come in here to be tortured for a day and a half, how many feet from A to B, how many feet from B to C, was that pole there that night, was that light post there that night, how many feet is it from the cleaners to the coffee company to the corner or back to the other bar  that's all done ... to try to confuse you.
I confess I was confused. Is there any reason  well, let me say it this way.
Did any of you ask yourselves, as you were listening to a day and a half of cross-examination of [the victim], one of three people who saw the robbery, including those two, is there any reason why only five percent of the cross-examination was about the actual incident.... Didn't you want to hear more on cross-examination about what happened in the parking lot, about how they robbed him and beat him?
*18 The assistant prosecutor made yet another veiled comment on defendant's election not to testify by juxtaposing his reference to defendant's being one of three eyewitnesses with his comment that the jury would want to hear more about how he robbed and beat the victim.
In a final jab at the defense attorneys' motives the assistant prosecutor said:
Your job is to find out what the truth is and the truth is a long path through the woods. At the end of the path is a bucket of gold called the truth, and the object of lawyers in a court of law, fortunately or unfortunately, sometimes is to throw stumbling blocks in front of you good ladies and gentlemen when you're trying to find out what the truth is, but the Community relies on the fact that you use your common sense to determine the truth.
After he completed his summation and the jury had left the courtroom, the assistant prosecutor made the following comments that confirm our sense of the tone and thrust of his summation:
Judge, I didn't object in front of the Jury, because this trial has been dragged out, and, quite frankly, I was tired of hearing [Barnes's attorney] speak, but I looked at the Court as well as looked at [Barnes's attorney] stand here and look me right in the face and impugn my character in front of this Jury.
I didn't want to highlight it, and I didn't want [Barnes's attorney] to have to speak again in front of the Jury, so I did not object at the time. I know that the Court did not forget what happened.
Now, I don't know exactly the nature of my application at this point. I'm going to review the Rules of Professional Conduct. Certainly, certainly somewhere in our ethical code as to attorneys who impugn the character of a fellow professional in a court of law when that holds no place in the issue at trial has to be a violation of some ethical code.
I'm interested to know what the Court's thoughts are at this time before I call down to Trenton to the Ethics Committee to get some guidance. I would like the Court to recommend to me how I should act and what the Court, how the Court regards the slander that [Barnes's attorney] just employed.
The court wisely suggested that the assistant prosecutor "review the matter with your superiors and decide what action you wish to take."
In the absence of objections by defense counsel to the assistant prosecutor's summation, we may not reverse unless his excesses "so grievously affect the substantial rights of the defendant as to convince [the court] that they possessed a clear capacity to bring about an unjust result." State v. Hipplewith, *19 33 N.J. 300, 309 (1960); State v. Johnson, 31 N.J. 489, 510 (1960), cert. den., 368 U.S. 933, 82 S.Ct. 370, 7 L.Ed.2d 195 (1961). We have quoted from the transcript at length to demonstrate that despite the strong evidence of defendant's guilt, those excesses were so self-evident, persistent and serious that they had the clear capacity to bring about an unjust result.
The assistant prosecutor improperly used his summation to cast aspersions on defendant's election not to testify and to suggest that defendant committed the crimes with which he was charged because he was without funds. Moreover, in essence the assistant prosecutor, without support in the evidence, accused defendant of conspiring with his counsel to conceal and distort the truth. By the vehemence of his attack the assistant prosecutor converted the proceedings from a trial of issues by which a fact-finder may weigh the evidence fairly into a vehicle for exacting personal revenge upon defense counsel.
Reversed and remanded for a new trial.