255 N.J. Super. 435 (1992)
605 A.2d 716
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHARLES DARRIAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 1992.
Decided April 1, 1992.
*439 Before Judge MICHELS, O'BRIEN and CONLEY.
Robert L. Sloan, Assistant Deputy Public Defender, argued the cause for appellant (Wilfredo Caraballo, Public Defender, attorney; Robert L. Sloan, of counsel and on the brief).
Mark E. Bailey, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Mark E. Bailey, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.S.C. (temporarily assigned).
Following a jury trial defendant was convicted of purposeful or knowing murder in violation of N.J.S.A. 2C:11-3a(1) and (2) (Count One); felony murder in violation of N.J.S.A. 2C:11-3a(3) (Count Two); second degree sexual assault in violation of N.J.S.A. 2C:14-2c(1) (Count Three), and possession of a weapon for an unlawful purpose in violation of N.J.S.A. 2C:39-4d (Count Four). The jury was unable to reach a unanimous agreement on imposition of the death penalty on the capital murder conviction. Defendant was, therefore, sentenced to a term of life imprisonment with a 30-year parole disqualification on that conviction. The convictions for felony murder and possession of a weapon for an unlawful purpose were merged into the murder conviction. A consecutive sentence of ten years with a five-year parole disqualification was imposed on the aggravated sexual assault conviction. We affirm.
*440 On October 30, 1986, Pamela Mathis found the body of her sister, Santa Maria Pinkston, on the living room floor of the apartment they shared. She was lying face down with a coat hanger twisted around her neck. She was naked from the waist down with her pants around her right ankle. An autopsy on the body revealed the following. The victim was 5'2 1/2" tall and had weighed 125 pounds. There was a deep furrow in her neck caused by the wire coat hanger that had been twisted into a three-inch loop. The pathologist opined that extreme force had been used in order to draw the hanger around the victim's neck to such a small diameter. There was also a four-inch arc shape marked on her chin consistent with the wire hanger. There were hemorrhages in her eyes and lungs caused by asphyxia. In addition, there were bruises to her head and back caused by blunt trauma. Her face and lips were swollen and there were injuries inside her lower lip. In addition, there were three small lacerations in the victim's anus, along with a fresh drop of dried blood in its outer margin. The pathologist opined that these lacerations occurred around the time of death and were consistent with the forceful insertion of a penis. A fresh stain on her left upper thigh near the pubic area tested positive for semen and was consistent with having come from a nonsecretor. A test of defendant's blood revealed that he is a nonsecretor.
According to the pathologist, the cause of death was mechanical asphyxiation due to a wire hanger ligature strangulation. The victim would have lost consciousness within 30 seconds of the time that the ligature was placed around her neck and that death would have occurred within three to five minutes. It was further the pathologist's opinion that the victim had been dead for at least 12 hours before her body was discovered. Her stomach contained two partial pieces of pickle and fragments of partially digested yellowish vegetative material consistent with french fries. Based on an examination of these substances, the pathologist opined that the victim ate between 20 minutes to one hour before her death.
*441 Defendant was arrested for the victim's murder. While being held in the Mercer County Detention Center, defendant told a fellow inmate, Winfred Hebert, whom he had known for about seven years, that he killed the victim by choking her with his hands because he loved her and was very jealous. However, defendant claimed that the killing was not intentional. A few days after the body was discovered, defendant's mother gave a written statement to the police in which she said defendant had telephoned her from work the morning the body was discovered and asked whether the police had come to the house looking for him. He told her to tell anyone who inquired about him that he was home the previous evening at about 9:15 or 9:30 p.m. and remained there the rest of the night. At trial, however, Mrs. Darrian said when defendant called he asked whether the police were looking for him because of traffic tickets and she denied he had told her to tell people he had been home the night before at any particular time. Defendant's sister, Bernice, testified, however, that on the night the victim was killed, at about 10:00 p.m. she saw defendant at his house and he told her the victim had refused to have sex with him, that they had argued and fought, that he had raped her and thought he had killed her. He asked Bernice to tell the police he had been at home all night.
The events and circumstances leading to the victim's death as reflected by the State's evidence were the following. Defendant and the victim began dating in September or October 1985. At that time, the victim was a senior at Trenton High School. Shortly after graduation, the couple's relationship deteriorated. Defendant contracted sexually transmitted body lice (crabs) and blamed the victim for his condition. Defendant was angry and jealous and argued with her because he felt she was "fooling around" with someone else.
There were several incidents of violence displayed by defendant towards the victim during this time. In July 1986, the victim's sister visited her at defendant's home. When the victim told defendant she and her sister were planning to visit *442 their grandmother, defendant slapped her and told her "she wasn't going anywhere."
On the evening of August 19, 1986, Samuel Page, an acquaintance of the victim, drove her to work at Mr. Goodbuy's. Darryl Dean, a friend of Page, accompanied the pair. After arriving at their destination, the group stood talking near Page's car in the store parking lot. A few minutes later, defendant drove up, exited his car and approached the group with a tire jack in his raised hand. Defendant appeared upset and asked the victim in an angry tone of voice "is this your new Goddamn boyfriend?" When no one in the group responded, defendant ran to his car, put it in reverse and intentionally crashed into the rear of Page's vehicle on which Page had been sitting. Defendant then got out of his car and wielded the tire jack above his shoulder in a threatening manner.
On October 16, 1986, defendant went to the victim's apartment to get a hammer. They got into an argument over a chain defendant was wearing around his neck and given to him by someone else. The victim hit defendant and he smacked her face two or three times. Daniel Villavisar, who was working in an adjoining grocery store at the time, heard screaming, shouting and the sound of breaking glass. He discovered that the victim had attempted to break through a windowed door that separated her apartment from the grocery store. Her hands were covered with blood and she was kneeling on the floor, crying in pain. She reported that defendant had assaulted her. The left side of her face was swollen, she had a black eye and pain in her chest and face. The victim was transported to a hospital emergency room where she was treated and x-rayed. Two days later, defendant returned to the victim's apartment and told her that if he caught her with anyone else, he would kill her.
On Saturday, October 25, 1986, the victim saw defendant and told him that she still wanted to date him but she also wanted to go out with other men. Defendant refused this suggestion *443 and told her such an arrangement would not work. Between that date and October 29, 1986, the victim engaged in sexual relations with another person.
On October 29, 1986 between 7:00 and 8:00 p.m. that evening, the victim walked by defendant's house and spoke with his brother who was sitting on the porch. She inquired whether defendant was at home. Upon discovering that defendant was still at work, she went home. However, Gwendolyn Alexander, who lived in a neighboring building and Bernice Darrian, the defendant's sister, saw defendant and the victim walking along the street in the direction of her apartment shortly after 9:00 p.m. on this same evening. Defendant was carrying a Burger King box and perhaps a soda, and the victim was carrying a Burger King bag.
At some point between 9:00 and 10:00 p.m. the same evening, Thomas Braswell, an upstairs neighbor, walked through the hallway and heard what he thought were "passion noises" from someone "making love" emanating from the apartment. Upon arriving upstairs, Braswell informed his fiancee, Mary Williams, about the sounds. Williams went into the hallway and stood on the second floor landing. From this position she heard noises that sounded like "lovemaking". Then she heard a scuffling noise and something that sounded as if someone was trying to say something that was being muffled by a hand over the person's mouth. Williams thought that a fight or argument might be in progress.
At some time after 9:00 p.m. that same evening, nine year old Lisa Williams, who lived in the apartment directly above the victim, was awakened by the sound of a woman screaming for help in the victim's apartment. Lisa thought that a fight might be in progress. She awakened her brother, eight year old Dennis Williams, who also heard a woman screaming for help. In addition, Dennis heard a slamming sound emanating from the victim's apartment. The body was found the next morning.
*444 A search of the apartment following discovery of the body revealed Burger King food wrappings and a Burger King cup with a straw, but no Burger King straw wrapper. A later search of defendant's car resulted in discovery of a Burger King straw wrapper. A fresh fingerprint from defendant's hand was discovered on the exterior of the rear door of the apartment.
About 30 minutes after the police arrived on the scene, defendant drove to the victim's apartment and parked across the street. Defendant asked the officers "what's happening?" He agreed to accompany the officers to police headquarters, where he was advised of his constitutional rights. He then gave a written statement in which he denied having been with the victim the previous night. Defendant claimed that he left his job at the Odd Lot at 8:58 p.m., bought a quart of beer at a bar and then drove home, arriving there at about 9:20 p.m. and went to sleep. The following morning, he went to his job at Saint Francis Hospital and when he arrived home from work that afternoon, was informed by his brother that police officers were at the victim's apartment. Defendant further maintained that he had terminated his relationship with the victim three weeks prior to her death because she told him of her desire to date other men, that he had not engaged in sexual relations with her for about one month preceding her death, and had last seen her one week before her death.
Defendant, who was 6'2 1/2" and weighed 212 pounds at the time of trial but who said he only weighed 180 pounds at the time of the victim's death, gave testimony during the trial that was basically consistent with the statement he gave the police. He denied having killed the victim and claimed that he was not jealous or possessive of her. He admitted he telephoned his mother from work the following morning, but said it was to inquire about her well-being. He did not ask his mother whether the police had come looking for him, nor did he instruct her to say that he was home between 9:15 and 9:30 the previous *445 evening. He denied he ever saw or spoke with Hebert while he was housed in the Mercer County Detention Center.
Defendant's mother and brother testified that defendant arrived home from work between 9:15 and 9:30 on the evening of the victim's death. After defendant's brother told him that the victim had stopped by the house, defendant went upstairs to bed.
An expert in forensic pathology testified for defendant. Based on his review of an autopsy photograph of the contents of the victim's stomach, he opined that she had eaten more than one hour before her death. He acknowledged that the lacerations and drop of blood found in the area of her anus were consistent with a sexual assault at the time of her murder. However, it was possible that they were the product of consensual sexual activity.
On appeal, defendant raises the following points:
I. THE TRIAL JUDGE'S REFUSAL TO PROVIDE THE REQUESTED INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER DENIED DEFENDANT THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10.
II. PROSECUTORIAL MISCONDUCT IN OPENING AND CLOSING STATEMENTS DENIED DEFENDANT THE RIGHT TO A FAIR TRIAL. U.S. CONST. AMENDS. IV, XIV; N.J. CONST. (1947) ART. 1, PARS. 9, 10.
III. DEFENDANT'S LIFE SENTENCE FOR MURDER AND CONSECUTIVE SENTENCE FOR SEXUAL ASSAULT WERE MANIFESTLY EXCESSIVE.
In a pro se supplemental brief, defendant also asserts:
1. CONTAMINATION OF JURY BY EXTRANEOUS INFLUENCES; JUDGE ERRED IN ALLOWING JURORS TO CONTINUE DELIBERATION UNDER THE INFLUENCE OF MARIJUANA.
2. INEFFECTIVE ASSISTANCE OF COUNSEL IN CONDUCTING PRETRIAL INVESTIGATION, AND PERFORMANCE DURING TRIAL PROCEDURES.
3. PRETRIAL PUBLICATION OF THE TRIAL IN THE NEWS MEDIA, WHICH WAS PREJUDICIAL, SUBLIMINALLY SUGGESTED OF GUILT, AND A VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHTS.
4. DISMISSAL OF SEXUAL ASSAULT CHARGE AND VACATION OF SENTENCE DUE TO INSUFFICIENT EVIDENCE.

*446 I.
Defendant contends that the trial judge erred by refusing his request to charge the jury with regard to the lesser-included offense of passion/provocation manslaughter. Specifically, defendant asserts the jury could have found from the evidence that he killed the victim "in a jealous rage after an argument about their relationship led, as on a prior occasion, to mutual combat."
Since defendant requested the charge below, we view this issue on appeal within the context of whether there existed a rational factual basis for a passion/provocation charge. State v. Sloane, 111 N.J. 293, 303, 544 A.2d 826 (1988); State v. Crisantos (Arriagas), 102 N.J. 265, 278, 508 A.2d 167 (1986). See N.J.S.A. 2C:1-8e. Although a court should not submit a lesser-included offense when to do so would invite the jury to engage in sheer speculation, State v. Rose, 112 N.J. 454, 480, 485, 548 A.2d 1058 (1988), the rational basis test establishes a "low threshold ... for permitting a charge on a lesser-included offense." State v. Crisantos (Arriagas), 102 N.J. at 278, 508 A.2d 167. See State v. Purnell, 126 N.J. 518, 531, 601 A.2d 175 (1992); State v. Erazo, 126 N.J. 112, 123, 594 A.2d 232 (1991); State v. Pennington, 119 N.J. 547, 561, 575 A.2d 816 (1990).
Originally grounded in common law, passion/provocation manslaughter is codified in N.J.S.A. 2C:11-4b(2). The statute defines passion/provocation manslaughter as "homicide which would otherwise be murder ... [that] is committed in the heat of passion resulting from a reasonable provocation." As described in State v. Crisantos (Arriagas):
Voluntary manslaughter is a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off. [102 N.J. at 274, 508 A.2d 167].
Passion/provocation manslaughter was, at common-law, a lesser-included offense to murder and developed, as noted in Crisantos, as "a concession to the frailty of man, a recognition *447 that the average person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate." Id. at 274, 508 A.2d 167. See State v. Guido, 40 N.J. 191, 209-10, 191 A.2d 45 (1963).
Four elements must exist for passion/provocation manslaughter to arise: (1) the provocation must be adequate, (2) there must not have been time for defendant to cool off between the provocation and the slaying, (3) defendant must have actually been impassioned by the provocation, and (4) defendant must not have actually cooled off before the slaying. State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990). The first two elements are objective, the latter two subjective.
As to the first, the provocation from an objective standard must be "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control." State v. King, 37 N.J. 285, 301-02, 181 A.2d 158 (1962). And the provocation must be sufficient enough so that the "`intentional homicide may be as much attributable to the extraordinary nature of the situation as to the moral depravity of the actor.'" State v. Mauricio, 117 N.J. at 412, 568 A.2d 879 (quoting Model Penal Code § 210.3, comment). Neither words alone, State v. Crisantos (Arriagas), 102 N.J. at 274, 508 A.2d 167, nor a "bump and an insult," State v. King, 37 N.J. at 301-02, 181 A.2d 158, are sufficient. But as observed in State v. Mauricio:
Although there may be a trend away from "the usual practice of placing the various types of provocatory conduct into pigeonholes," LaFave & Scott, supra, § 7.10, at 256, battery, except for a light blow, has traditionally been considered, almost as a matter of law, to be sufficiently provocative. Ibid.; see also State v. Herrmann, supra, 77 N.J.L. [534] at 535 [76 A. 1086 (1909)] ("it would clearly be a jury question whether a blow in the face, either by fist or by open hand, would not be sufficient to exclude murder"). [117 N.J. at 414, 568 A.2d 879].
Here, defendant contends that he was entitled to a passion/provocation manslaughter instruction because the jury could have found from the evidence that he killed the victim in a jealous rage after an argument about their relationship led to "mutual combat." We disagree. The evidence, viewed in the *448 light most favorable to defendant, State v. Mauricio, 117 N.J. at 412, 568 A.2d 879, does not provide a basis for a jury to rationally conclude the asserted provocation was sufficient to inflame the passion of a reasonable person. Id. at 412, 568 A.2d 879. Although defendant told a fellow inmate that he had killed the victim because he loved her and was very jealous, there is no evidence that the couple engaged in "mutual combat" on the evening of the slaying. None of the neighbors who heard noises emanating from the apartment described those noises as sounds of defendant receiving any blows or yelling out for assistance. Braswell heard what he thought were "passion noises" from someone "making love". Mary Williams initially heard noises that sounded like "lovemaking," then a "scuffling noise, or ... muffling, like somebody's hand was over your mouth or something, like you were trying to say something ...". Lisa Williams was awakened by the sound of a woman screaming for help. Dennis Williams also heard a woman screaming for help and a slamming sound.
The only other evidence concerning the events that occurred in the victim's apartment on the evening of her death was defendant's statement to his sister, Bernice Darrian. Defendant told Bernice that the victim had refused to have sex with him. He further stated that the couple had argued and fought and that he had raped and killed her. Significantly, however, defendant did not tell Bernice that the couple had engaged in "mutual combat."
It is generally accepted that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter. State v. Mauricio, 117 N.J. at 413, 568 A.2d 879; State v. Crisantos (Arriagas), 102 N.J. at 274, 508 A.2d 167. Nor does sexual rejection by a paramour constitute adequate provocation. State v. McClain, 248 N.J. Super. 409, 419, 591 A.2d 652 (App.Div.) certif. denied, 126 N.J. 341, 598 A.2d 897 (1991); State v. Hollander, 201 N.J. Super. 453, 475, 493 A.2d 563 (App.Div.), certif. denied, 101 *449 N.J. 335, 501 A.2d 983 (1985). And, although mutual combat under certain circumstances can constitute adequate provocation to reduce murder to manslaughter, the provocation must be proportionate to the manner of retaliation and therefore if a defendant on a slight provocation attacked the victim with violence out of proportion to the provocation, the crime is murder. State v. Crisantos (Arriagas), 102 N.J. at 280 n. 12, 508 A.2d 167.
Thus, in State v. Oglesby, 122 N.J. 522, 585 A.2d 916 (1991), the evidence was found insufficient to support jury consideration of adequate provocation where defendant was convicted of murdering a woman who had given birth to their son and with whom he had a "stormy" relationship for eight years, but who had been hacked and stabbed 50 times with three knives. Controverted evidence suggested that the victim struck defendant before he killed her. In rejecting defendant's argument that he was entitled to a charge on passion/provocation manslaughter, the court observed that even if the victim struck defendant, "we cannot hold that the jury should have been allowed to find that a single blow by an unarmed woman could have aroused the passions of an ordinary man beyond the power of his control." 122 N.J. at 536, 585 A.2d 916.
Similarly, in State v. Crisantos (Arriagas), 102 N.J. 265, 508 A.2d 167, a 54 year-old unemployed, inebriated victim was robbed and murdered on his way home. The State's evidence showed that defendant and another person attacked the victim, disabled him by breaking his ankle and then robbed him. When someone approached, they hid nearby. After the person left to call the police, they jumped on top of the victim stabbing him repeatedly. The defendant's version was that the victim instigated a fight by calling them names and ethnic epithets and then initiated a physical altercation during which he was stabbed. Characterizing this version as conveying a "gross mismatch, an older inebriated man against two younger men, at least one armed with a knife," the court found no evidence of *450 passion or extreme emotional disturbance. Id. at 279-80, 508 A.2d 167.
See also State v. Purnell, 126 N.J. at 540-42, 601 A.2d 175 (evidence that defendant murdered the victim during a fight following a "drug deal gone sour" not sufficient to support a passion/provocation charge); State v. Perry, 124 N.J. 128, 590 A.2d 624 (1991) (evidence that victim, angered in a dispute over drug money, spoke harshly to defendant, walked toward him, and pointed at him while defendant was trying to inject himself with drugs and a fight thereafter occurred insufficient to provide a basis for passion/provocation charge).
Defendant argues that the series of events which occurred during his relationship with the victim in the weeks preceding her death caused a "detonating force" to accumulate which constituted adequate provocation when coupled with the events that occurred on the evening of the killing. State v. Guido, 40 N.J. at 211, 191 A.2d 45. When there is evidence of prior physical abuse of defendant by the victim, a finding of provocation may be premised on a course of ill-treatment which defendant reasonably believes is likely to continue and which can induce a homicidal response in an ordinary person. See for example State v. Erazo, 126 N.J. 112, 594 A.2d 232; State v. Coyle, 119 N.J. 194, 574 A.2d 951 (1990); State v. Guido, 40 N.J. at 191, 191 A.2d 45.
In Erazo, the defendant and victim were husband and wife. Their marriage was marked by passion, recriminations and violence by both the defendant and his wife which persisted on the day of the murder. In Coyle, the victim had consistently physically abused his wife with whom defendant had a close relationship. At the time of the killing, the victim and his wife engaged in an argument resulting in physical violence. Defendant shot the victim in the alleged belief he was going to kill his wife. In Guido, the victim was defendant's husband. Prior to the murder, there were a few incidents of physical assaults upon the wife and constant threats of harm. Just prior to his *451 death, the victim went to defendant's place of employment, brandished a pocket knife and attempted to choke defendant. Shortly thereafter, when defendant refused to move to Florida, the victim threatened her with a gun. After he fell asleep, she shot him. In finding that defendant was entitled to a passion/provocation manslaughter charge the Supreme Court observed:
It seems to us that a course of ill treatment which can induce a homicidal response in a person of ordinary firmness and which the accused reasonably believes is likely to continue, should permit a finding of provocation. In taking this view, we merely acknowledge the undoubted capacity of events to accumulate a detonating force, no different from that of a single blow or injury. The question is simply one of fact, whether the accused did, because of such prolonged oppression and the prospect of its continuance, experience a sudden episode of emotional distress which overwhelmed her reason, and whether, if she did, she killed because of it and before there had passed time reasonably sufficient for her emotions to yield to reason. [40 N.J. at 211, 191 A.2d 45. Emphasis added].
The evidence here is significantly different from Erazo, Coyle and Guido. The victim did not subject defendant to a course of abusive treatment which defendant could have reasonably believed was likely to continue. And clearly, the fact that the victim had told defendant that she desired to date other men and that he suspected her of "messing around," did not constitute a course of ill treatment which could have induced a homicidal response in a person of ordinary firmness since defendant himself was involved in a sexual relationship with another woman. Moreover, defendant alone was armed. Even if one were to speculate that the victim might have struck defendant during an argument that stemmed from her refusal to engage in sexual relations, such an action by an unarmed woman who was only 5'2 1/2" tall and weighed 125 pounds could not have aroused the passions of an ordinary man beyond the power of his control. Further, the brutality of the homicide, which involved bruises caused by blunt trauma as well as the extreme force required to draw the hanger around the victim's neck to a three inch diameter, was out of proportion to the *452 provocation even if one were to speculate that the victim might have struck defendant.
We think the circumstances here are similar to those in State v. McClain, 248 N.J. Super. 409, 591 A.2d 652, in which defendant was convicted of murdering a man with whom she had a long-term intimate relationship. While there was evidence of discord in the relationship due to the victim's tendency to have affairs with other women and evidence that the victim had physically assaulted defendant on two occasions, these occurred three or four years prior to the victim's death. The claim of provocation was based on the fact that the victim broke two dinner dates the week before his death, discovery by defendant that the victim had fathered a child and the fact that on the day of the slaying, the victim ignored defendant when she entered a bar in which he was seated and told her that he would do whatever he pleased and never intended to marry her. Defendant became hysterical, reentered the bar and shot the victim because she was tired of him "cheating" on her. On appeal, we held that defendant was not entitled to a passion/provocation charge since the evidence was insufficient to support an objective determination that there was adequate provocation. We noted that there was an absence of either physical abuse or threat of physical harm within any reasonable period of time prior to the murder. We further observed that defendant's knowledge of the victim's fathering a child was not the first time she suspected him of such behavior.
Similarly, here there is an absence of either physical abuse or threat of physical harm towards defendant by the victim within the week prior to her murder. Moreover, defendant had suspected her of cheating on him for at least several months before the murder when he discovered that he had contracted sexually transmitted body lice. Thus there is no more evidence here to support a passion/provocation charge than there was in McClain. We find no error in the trial judge's refusal to so charge.

*453 II.
Defendant contends certain comments by the prosecutor during opening and closing statements constituted prosecutorial misconduct and deprived him of a fair trial. In this respect, he argues that in opening, the prosecutor made an emotional appeal to the jury by several times referring to the victim as "a girl who was 18 years old ... very pretty ... who had ambitions for herself ... being 18 and on her own, essentially on her own, she was making judgments for herself as part of her growth, some of them were right, and some of them were wrong ... a [sic] 18 year old learning and growing and making decisions."
We agree the prosecutor's reference to the fact that the victim was a very pretty and ambitious young woman who may have made a couple of mistakes in judgment as a result of her young age, was improper. State v. Marshall, 123 N.J. 1, 163, 586 A.2d 85 (1991); State v. Pennington, 119 N.J. 547, 569-71, 575 A.2d 816 (1990); State v. Williams, 113 N.J. 393, 451, 550 A.2d 1172 (1988). Where the victim's character and future plans have no bearing on the substantive issue of guilt, the prosecutor may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury. State v. Clausell, 121 N.J. 298, 341, 580 A.2d 221 (1990); State v. Pennington, 119 N.J. at 570, 575 A.2d 816; State v. Williams, 113 N.J. at 448-449, 451-452, 550 A.2d 1172. However, not every deviation from perfection on the part of a prosecutor warrants a reversal of a conviction. State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739 cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). To justify reversal the prosecutor's conduct must have been clearly and unmistakably improper and the improper conduct must have resulted in substantial prejudice to the defendant's fundamental right to have a jury fairly assess the persuasiveness of his case. State v. Williams, 113 N.J. at 452, 550 A.2d 1172. Here, the prosecutor's reference to the victim's attractiveness and ambitions and *454 her possible mistakes in judgment were isolated comments which did not substantially prejudice defendant's right to a fair trial. See State v. Marshall, 123 N.J. 1, 163, 586 A.2d 85 (1991) (prosecutor's comment that victim had a right to live her life in full and to watch her children grow held not to be reversible error since it was neither extensive nor inflammatory); State v. Hightower, 120 N.J. 378, 411-412, 577 A.2d 99 (1990) (prosecutor's isolated comment that "today" would have been the victim's 27th birthday had it not been for defendant's conduct held not to be reversible error since it came at the end of a long summation that was largely devoted to a fair review of the evidence). Moreover, the trial judge here instructed the jurors that what the attorneys said in their openings was not evidence and that they were to decide the case without bias, prejudice or sympathy. There can be no assumption that the jury did not faithfully follow this admonition. State v. Manley, 54 N.J. 259, 271, 255 A.2d 193 (1969).
Defendant also argues that several comments made by the prosecutor during summation constituted prosecutorial misconduct and denied him a fair trial. The first comment to which defendant objects is the prosecutor's reference to emotion. In this respect, the prosecutor said:
The defense argues to you that emotion has no part in this case, that raising one's voice is not part of the lexicon of the lawyer, that in his summation it is improper in some way. Well, ladies and gentlemen, when we have an 18 year old girl who was murdered by having a coat hanger wrapped around her neck to a diameter of three inches and wrapped six times to expel her life from her body, then there is emotion in this case. Of course in your deliberations, you may not permit passion, prejudice or sympathy to enter into your verdict. You must exclude that from those deliberations, but to say that emotion is not part of this case is wrong. Mr. Obler [defense counsel] says to you we shouldn't be raising our voices here, that we shouldn't go above a normal tone. Mr. Obler well knows that I do go above a normal tone on occasion and I will go above a normal tone when it is appropriate and I submit it is appropriate in this case to do so, but it is not the tone that is important. It is the words.
Defense counsel did not object to these remarks at trial. While a prosecutor cannot resort to improper appeal to the jury's emotions, State v. Williams, 113 N.J. at 453, 550 A.2d 1172, the *455 remarks here were made in direct response to defense counsel's summation during which he stated: "There is no need to yell, no need to scream. There is no need to raise up the tide of emotionalism to get you to return a verdict." "[Y]ou may hear a lot of emotionalism in this case. You might hear yelling and screaming or loud tones. You might hear a lot about the person who is dead or how the person died, but be very careful ..., do not let emotionalism run wild." Since the prosecutor's response, then, was "invited" by defense counsel's summation, the issue is whether it unfairly prejudiced defendant. State v. Engel, 249 N.J. Super. 336, 379, 592 A.2d 572 (App.Div.), certif. denied, ___ N.J. ___ (1991). We think not. The trial judge instructed the jury that it was to decide the case on the evidence presented without bias, prejudice or sympathy. We assume they followed that instruction. State v. Manley, 54 N.J. at 271, 255 A.2d 193.
The second portion of the prosecutor's summation to which defendant objects was also made in response to defense counsel's summation during which he remarked: "[W]here did you hear one piece of evidence about a sexual assault?" The prosecutor responded by stating:
Mr. Obler [defense counsel] indicated, where did you hear one piece of evidence about sexual assault in this case? I ask you to take a look at S-59. You saw this photograph. You heard graphic testimony about how the victim's body was found, nude from the waist down, that she had injuries to her anal area, that she had semen between her thighs, and that the defendant told his sister that he had raped her and killed her. How could that question be asked of you? Where did you hear one piece of evidence about sexual assault? The defense says the State's case is speculation. Ladies and gentlemen, you have heard this case. Have we done something wrong in bringing this case to you?
Defense counsel posed an immediate objection and stated: "I want an instruction on that. That is not their function." The court sustained the objection and told the jury that it was to disregard the comment since it concerned a matter that was not for the jury's consideration. Thus, any prejudice that may have been caused by the prosecutor's comment was cured by the judge's swift instruction to the jury to disregard the remark. State v. Farrell, 61 N.J. 99, 107, 293 A.2d 176 (1972); State v. *456 Bogen, 13 N.J. 137, 141-142, 98 A.2d 295, cert. denied sub. nom. Lieberman v. New Jersey, 346 U.S. 825, 74 S.Ct. 44, 98 L.Ed. 350 (1953).
The third group of comments to which defendant objects were made in response to defense counsel's summation during which he argued that the State's case was based on "speculation" and that the jury would have to forget everything that Winfred Hebert testified to regarding "time, place, location and occurrence" in order to believe Hebert's testimony. Defense counsel also argued that a picture of the victim's apartment, S-70, depicted a straw wrapper and that it "may or may not" be from Burger King. In response, the prosecutor commented during summation:

The argument to you that this case is speculation, I submit in light of the evidence that you have received in this matter, is misdirecting you from the truth.

........
Mr. Obler [defense counsel] says, as part of his argument to you, that times are important. Well, times, ladies and gentlemen, are important to some extent, but people make mistakes about times. Material facts are what stick in your mind. What happened sticks in your mind, not when it happened. That is something your common sense and human experience teaches you. Yesterday or last week or four days ago or eight months ago, you might remember what happened. Distances and times are the arsenal of the lawyer to trip up the honest. I submit that you should be very careful about evaluating what doesn't stick in people's minds. You are being asked to use that to evaluate what does stick in people's minds.
........
The first thing we hear about by the defense is this photograph, S-70, with what appears to be a straw wrapper by the edge of the bed.... Well, I think as you look at that closely, you will see the letters MAR on it. Then there appears to be a "C" perhaps after that. It may say Marcal.... One might say that the exposition of that picture to you was grasping at straws.

[Emphasis added].
Although defense counsel did not object to the above-quoted comments at trial, he now argues that the remarks were improper because they disparaged defense counsel and his role in the criminal justice system and portrayed him and defendant as participants in a conspiracy to concoct a defense.
*457 It is improper for a prosecutor during summation to demean the role of defense counsel or cast aspersions upon a lawyer's motives. State v. Thornton, 38 N.J. 380, 397, 185 A.2d 9 (1962), cert. denied, 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963); State v. Pindale, 249 N.J. Super. 266, 286, 592 A.2d 300 (App.Div. 1991); State v. Lockett, 249 N.J. Super. 428, 434, 592 A.2d 617 (App.Div. 1991); State v. Sherman, 230 N.J. Super. 10, 16, 552 A.2d 621 (App.Div. 1988). It is likewise improper for a prosecutor, without support in the evidence, to accuse a defendant of conspiring with his counsel to conceal and distort the truth. Id. at 19, 552 A.2d 621. We do not view the prosecutor's comments here as so doing. Rather, the prosecutor's comment that defense counsel was "grasping at straws" by suggesting that the straw wrapper depicted on the picture of the victim's apartment was from Burger King was a legitimate comment upon the evidence since there was testimony that the police did not discover a Burger King straw wrapper during their search of the apartment, but did find one in defendant's car. And, although it was improper for the prosecutor to argue that defense counsel was misdirecting the jury from the truth and trying to "trip up" honest witnesses, the prosecutor's dereliction was isolated. Furthermore, the judge instructed the jury that what the attorneys said in their summations was not evidence. State v. Manley, 54 N.J. at 271, 255 A.2d 193. See State v. Watson, 224 N.J. Super. 354, 362, 540 A.2d 875 (App.Div.), certif. denied, 111 N.J. 620, 546 A.2d 537, cert. denied, 488 U.S. 983, 109 S.Ct. 535, 102 L.Ed.2d 566 (1988) (although prosecutor erred during summation by implying that defense counsel's role was to obfuscate the facts, defendant was not deprived of a fair trial where the comment was isolated and trial court's instruction to the jury that counsel's remarks did not constitute evidence and were not to have any part in its deliberations obviated the potential for prejudice). Moreover, defense counsel's failure to object to the remarks indicates that in the atmosphere of the trial the defense did not believe that *458 the prosecutor's comments were prejudicial. State v. Wilson, 57 N.J. 39, 51, 269 A.2d 153 (1970).
Defendant also contends for the first time on appeal that the prosecutor engaged in improper "name calling" during his summation by arguing to the jury that defendant had lied during his testimony as well as in his statement to the police. Derogatory name calling by a prosecutor constitutes misconduct. State v. Clausell, 121 N.J. at 341, 580 A.2d 221; State v. Pennington, 119 N.J. at 576-77, 575 A.2d 816; State v. Williams, 113 N.J. at 456, 550 A.2d 1172. See State v. Purnell, 126 N.J. at 539, 601 A.2d 175; State v. Marshall, 123 N.J. at 159-61, 586 A.2d 85. It is, however, not improper for a prosecutor to comment on the credibility of a defendant's testimony. State v. Robinson, 157 N.J. Super. 118, 120, 384 A.2d 569 (App.Div.), certif. denied, 77 N.J. 484, 391 A.2d 498 (1978). See State v. Purnell, 126 N.J. at 538, 601 A.2d 175. Here the objected to remarks constituted comments upon the evidence and the credibility of defendant's testimony.
Prosecuting attorneys are afforded considerable leeway, within limits, in making their summations. State v. Williams, 113 N.J. at 447, 550 A.2d 1172. "The determination of whether prosecutorial misconduct denied defendant the right to a fair trial must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties ..." State v. Marshall, 123 N.J. at 153, 586 A.2d 85. Here most of the remarks complained of were not objected to. Although some of the remarks approached the limits of permissible advocacy on the part of a prosecutor, none of the remarks was "so egregious that it deprived defendant of a fair trial." State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987).

III.
We have carefully considered defendant's remaining contentions and the supporting argument and applicable law. We are convinced they are clearly without merit. R. 2:11-3(e)(2).

*459 IV.
The judgment of convictions and sentences are affirmed.