# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3454-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GUALBERTO L. LEBRON,

    Defendant-Appellant.

_____

<div style="border:1px solid black; display:inline-block; padding:6px; text-align:center;">

**APPROVED FOR PUBLICATION**

**February 24, 2026**

**APPELLATE DIVISION**

</div>

Submitted September 24, 2025 – Decided February 24, 2026

Before Judges Gummer, Paganelli, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 20-12-0715.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Molly O'Donnell Meng, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Amanda G. Schwartz, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

GUMMER, J.A.D.

Defendant Gualberto L. Lebron appeals from his conviction for murder and other offenses relating to the assault and death of Julia Vega, his former girlfriend and mother of his children. Defendant claims the trial court erred by admitting into evidence hearsay statements of the victim under the forfeiture-by-wrongdoing exception to the rule against hearsay, N.J.R.E. 804(b)(9). We reject his argument because, as a matter of first impression, we agree with the courts of other jurisdictions that it need not be shown under this hearsay exception that rendering the witness unavailable was the sole reason for the defendant's conduct. We also reject defendant's remaining arguments about the trial court's failure to charge passion/provocation manslaughter and the sentence imposed. Accordingly, we affirm.

I.

A jury convicted defendant of murdering Vega in her apartment on May 9, 2018, when their youngest child was approximately six years old. Vega had moved to the apartment with her children in 2017 in part to gain independence from defendant. However, at some point defendant began staying in the apartment. According to Vega's next-door neighbor and friend, Vega did not want him to live there and never gave him permission to live there, but defendant nevertheless moved his possessions into the apartment, telling Vega he was going to stay there for a short time while he was waiting for his new

2

apartment to be ready. Vega repeatedly asked defendant to leave, but he refused. Instead, defendant installed cameras in the apartment he could use to monitor Vega. Vega also was concerned defendant was following her. Defendant stood at least a foot taller and weighed roughly 100 pounds more than Vega.

Sometime in 2018, Vega began to date her co-worker's brother. She told him her children's father was staying with her and her children, she was not in a relationship with him, and she had been trying for months to get him out of the apartment.

In multiple texts sent in April and May 2018, Vega told defendant she wanted him to get his own apartment and leave her alone. In texts she sent on April 25, Vega accused defendant of being a stalker and threatened to call the police. On April 30 and May 1, defendant sent Vega several texts using crude language commenting on and asking about the man she was dating. On May 3, after a phone call with Vega, defendant texted her, asking whose voice he had heard in the background. After Vega replied, "[k]ids," defendant texted, "I hear a deeper voice than kids."

In a recorded statement, Vega told police that on the morning of May 5, defendant had locked the front door of the apartment to prevent her from entering it. When she eventually was able to open the door, defendant pushed

her and she "grabbed the . . . door knob," "threw it at him," and "told him to get out of [her] house." Vega told police defendant had "start[ed] choking [her] until [she] was on the floor" and lost consciousness. According to Vega, when she woke up, defendant had undone her belt and her pants zipper and touched her in her genital area, "checking" her vagina. When Vega stood up and ran outside, defendant ran after her.

Hearing a scream, the neighbor looked out a window and saw Vega on the ground with defendant "pulling on" her. When she went outside with her husband to help Vega, the neighbor heard defendant say to Vega, "bitch, I'll kill you, bitch you'll be dead." A video recording of that incident from the neighbor's outside surveillance camera was shown at trial.

The neighbor pulled Vega aside, noticing her pants were unbuttoned and her belt was unbuckled. Vega told the neighbor she had run outside after defendant choked her until she passed out and then choked her again when she awoke. Vega also told her defendant was angry because she had been out that night and he thought she had had sex with another man. Vega reported to her that defendant had assaulted her and "pulled her pants down . . . to see if she was doing anything with anybody." The neighbor saw bruises on Vega's neck; Vega told her defendant had caused them. The neighbor photographed the bruises and called the police. An officer documented and photographed Vega's

injuries; Vega told the officer defendant had said to her "he was going to kill her." Vega later changed the locks, and the neighbor's husband nailed shut the windows on the first floor of Vega's apartment.

Later that day, Vega sent photographs of her neck to her co-worker and her co-worker's brother and told them defendant had choked her. She also told her co-worker's brother that defendant had "tried to kill" her. Vega texted defendant that she would "see [him] in court." On May 7, defendant repeatedly texted Vega, telling her to "go drop the charges" and "dismiss the charges," but Vega refused.

As captured in a video that was shown at trial and as seen by the neighbor, defendant entered Vega's backyard the next morning. The neighbor, who called 9-1-1, witnessed Vega and defendant arguing outside. She heard defendant ask Vega to drop the charges and Vega's response: "hell no, I ain't going to drop the charges and you better leave before the police get here." As defendant turned around and walked away, the neighbor heard him threaten Vega: "If you don't drop the charges, bitch, I'll kill you."

Later that morning, Vega provided to a police officer a statement about that encounter; an audio recording of that statement was played for the jury at trial. After giving her statement, Vega told the officer, "[h]e's going to kill me." The officer gave Vega the option to stay at a safe house, but she

5

declined. An arrest warrant for defendant was issued at approximately 7:30 p.m. on May 9, 2018, but by that time, Vega was already dead.

On the morning of May 9, the neighbor saw Vega leave for work. Around noon, Vega called the police officer to whom she had given the statement and reported defendant was "driving around her job." She asked the officer to arrest defendant "so she could sleep fine . . . for at least one night." At 12:18 p.m., Vega texted her co-worker's brother that she was "going home to take the dogs out" and "check around." Vega did not return to work after lunch. She did not pick up her children from school. At around 4:00 p.m., the neighbor used a key she had to enter Vega's apartment. Vega was not there; her dogs were in a cage. The neighbor called the police to report Vega's disappearance. Defendant's mother eventually picked the children up from school. That day, Vega's oldest daughter saw defendant give Vega's phone to one of the other children. When she asked defendant where her mother was, defendant told her she "ran off with another man."

On May 9, defendant also saw his cousin, who described himself as defendant's best friend. They discussed "the domestic incident," apparently referencing the May 5 assault. Defendant told the cousin he had put his hands around Vega's neck during that incident and that a warrant had been issued for his arrest. The cousin understood Vega had "put her hands" on defendant

during that incident. The next day, defendant borrowed a white Ford Crown Victoria from the cousin.

Cellular telephone data showed that on May 9 defendant's phone was in the area of Vega's workplace at 12:21 p.m. and near Vega's apartment at 12:39 to 12:44 p.m. Between noon and 1:30 p.m., a different neighbor observed defendant "sneaking around" outside Vega's apartment and "[p]eering over" a fence into her backyard. Defendant said to that neighbor, "[y]ou didn't see me," and made a "shushing motion" with his finger. The neighbor witnessed defendant climb the fence into Vega's backyard and make "multiple trips" into and out of the building, carrying bags of clothes, cleaning supplies, and electronics.

Surveillance videos from the apartment complex recorded on May 9 were shown to the jury. One video showed a man drive into the parking lot in a white vehicle shortly after 12:30 p.m. After opening and closing the car trunk, the man walked towards the apartment complex. Another video, recorded between 1:47 p.m. and 2:00 p.m., depicted a white minivan backing up over the sidewalk to the door of the apartment complex and a man exiting the driver's seat, dragging a rolled-up rug from the ground into the minivan, and driving away. Vega owned a white Toyota Siena minivan. The prosecutor

7

argued in summation that the video showed defendant loading Vega's body wrapped in a rug into her minivan.

On May 11, the police found Vega's minivan on a street where defendant had been working and renting garage space. A cadaver dog alerted police to the rear area of the minivan. Forensic testing found blood stains on the floor mat and center console, and DNA analysis confirmed the blood was Vega's. A surveillance video recorded on May 9, shortly after 4:30 p.m., showed a man parking the minivan where police ultimately found it. Other surveillance video played during the trial showed defendant at a Walmart shortly after 1:00 a.m. on May 11. A receipt from that visit listed his purchases, including a pay-as-you-go phone card, strong repair tape, contractor garbage bags, and ammonia. A review of defendant's Google account activity on May 11 showed search queries for "chemicals used in Mexican cartels" and "chemicals used to disintegrate animals" and a visit to an article entitled "Soluble Dilemma: How long does it take to dissolve a human body?"

That evening, police found defendant driving his cousin's white Crown Victoria. After a chase in which defendant ignored stop signs and police signals, police stopped defendant and arrested him.

In a May 18 search of the garage defendant was renting, police found a backpack containing prescription bottles labeled with Vega's name and a ring

A-3454-22

similar to a ring Vega was wearing when she was last seen on May 9. Police also found in the backpack one hundred glassine envelopes containing a suspected controlled dangerous substance. The contents of one of the glassine envelopes later tested positive for heroin and fentanyl.

Police gathered evidence from Vega's apartment. On the evening of May 9, police went to the apartment at approximately 5:00 p.m. after the neighbor had reported Vega missing. An officer noticed a broken window frame in the dining room. On May 14, police searched and photographed Vega's apartment. As one detective later testified, the living room looked as if "there must have been some form of a violent or aggressive type struggle" because "the furniture was all moved out of position," the coffee table was out of place, and "things were not set the way they should be set." A rug that had been present in the living room when police were present on May 5 was missing.

On May 22, police forensically searched Vega's apartment for blood using Luminol and Kastle-Meyer testing. See State v. Pittman, 419 N.J. Super. 584, 591 (App. Div. 2011) (noting the Kastle-Meyer test is conducted to determine the possible presence of blood); State v. Urcinoli, 321 N.J. Super. 519, 530 (App. Div. 1999) ("Luminol is a chemical reagent that causes a

A-3454-22

luminescence to appear if blood is present."). Two areas in the living room, as well as a mop and a bucket found in the apartment, tested positive for blood.

On June 1, after receiving a report of "a foul smell coming from the back yard" of an "abandoned, dilapidated" home, police found Vega's decomposed body in a black bag wrapped in duct tape. Due to the significant decomposition of the body and the "extensive loss of soft tissues," the only injury the forensic pathologist who conducted the autopsy could document was a vertical fracture of the left mandible, which was caused by "a strong blow applied to the side of the face in one area" that was "strong enough to cut the jaw in one shot." He concluded Vega had died by "homicidal violence including . . . blunt impact injury."

On December 8, 2020, a grand jury returned an indictment charging defendant with second- and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) and (13); first- and second-degree sexual assault, N.J.S.A. 2C:14-2(a)(3) and (c)(1); second-degree robbery, N.J.S.A. 2C:15-1, based on events that occurred on May 5; first-degree murder, N.J.S.A. 2C:11-3(a)(1) or N.J.S.A. 2C:11-3(b)(4)(f) or (g); first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); first-degree robbery, N.J.S.A. 2C:15-1; second-degree burglary, N.J.S.A. 2C:18-2; first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree witness tampering, N.J.S.A. 2C:28-5(a); fourth-degree stalking,

10

N.J.S.A. 2C:12-10(b); second-degree conspiracy to desecrate human remains, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:22-1(a); second-degree desecration of human remains, N.J.S.A. 2C:22-1(a); third-degree conspiracy to hinder prosecution, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:29-3(b); third-degree hindering prosecution, N.J.S.A. 2C:29-3(b); three counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); third-degree unlawful possession of heroin, N.J.S.A. 2C:35-10(a); third-degree unlawful possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3); third-degree unlawful possession of heroin with intent to distribute within 1,000 feet of a school, N.J.S.A. 2C:35-7.1(a); second-degree eluding, N.J.S.A. 2C:29-2(b); and third-degree theft, N.J.S.A. 2C:20-3(a), based on events that occurred on May 9.[1]

Prior to trial, the State moved to admit Vega's statements under N.J.R.E. 804(b)(9), the forfeiture-by-wrongdoing hearsay exception. Those statements included: her statements to police; her statements to her neighbor, her co-worker, and her co-worker's brother; and her text and Facebook messages. During an evidentiary hearing, a sergeant from the prosecutor's office testified

---

[1] The grand jury included in the indictment charges against defendant's brother, Gilberto Lebron. The brother was tried with defendant and was convicted of second-degree conspiracy to desecrate human remains, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:22-1(a); third-degree conspiracy to hinder prosecution, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:29-3(b); and third-degree hindering the prosecution of another, N.J.S.A. 2C:29-3(a)(3). The brother did not participate in this appeal.

about and presented Vega's audio-recorded May 8 statement to police about the May 5 assault and an audio-recorded statement of the neighbor taken on May 12. He also testified about other evidence of defendant's guilt, including the May 9 video recording of a man placing a rolled-up rug into the minivan, statements by defendant's cousin, and records regarding defendant's May 9 cell phone activity to support the State's argument under N.J.R.E. 804(b)(9) that defendant was responsible for Vega's absence from trial.

After hearing that evidence and the arguments of counsel, the court placed a decision on the record on March 30, 2022, granting the motion. The court found the State had proven by a preponderance of the evidence defendant "engaged in such wrongful conduct, directly or indirectly, that caused the witness's unavailability." The court characterized the evidence of defendant's guilt as "overwhelming." Finding the State had proven defendant intended to procure Vega's absence from any trial regarding the May 5 assault, the court concluded defendant should not benefit from her absence and granted the State's motion to admit her statements under N.J.R.E. 804(b)(9). On May 11, 2022, the court entered an order and written decision granting the motion and memorializing its oral ruling.

The case was tried before a jury in 2023. During two charge conferences, defense counsel argued for the inclusion of an instruction on

passion/provocation manslaughter. The court ultimately found "no legal basis" to give that instruction. Citing State v. Darrian, 255 N.J. Super. 435 (App. Div. 1992), and State v. McClain, 248 N.J. Super. 409 (App. Div. 1991), the court held sexual jealousy or sexual rejection is not "adequate provocation to reduce murder to manslaughter." The court found the evidence demonstrated defendant was "extremely jealous of . . .Vega and the fact that she was moving on, . . . and was involved in another . . . relationship" and was "obsessed" with her, but that evidence was "insufficient to rise to the level of . . . provocation that would somehow justify him, or a person of ordinary . . . control, . . . killing her."

The jury convicted defendant on all counts except the counts on first-degree robbery and second-degree eluding. On the second-degree-robbery count, defendant was convicted of the lesser-included offense of third-degree theft.

At sentencing, the court considered aggravating and mitigating factors, finding aggravating factors one ("nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner"), three ("risk that the defendant will commit another offense"), and nine ("need for deterring

13                                                          A-3454-22

the defendant and others from violating the law") applied. N.J.S.A. 2C:44-1(a)(1), (3), and (9). The court found no applicable mitigating factors.

After appropriately merging certain convictions, the court sentenced defendant to an aggregate prison term of 106 years. Regarding the murder conviction, the court imposed a mandatory life term without possibility of parole, which "shall be deemed to be [seventy-five] years." N.J.S.A. 2C:43-7.2(b).

The court imposed a seven-year term with an eighty-five percent period of parole ineligibility and a three-year period of parole supervision under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the aggravated-assault conviction and a fifteen-year term with an eighty-five percent period of parole ineligibility and a five-year period of parole supervision under NERA on the sexual-assault conviction. The court imposed four-year terms for the theft convictions, a seven-year term with an eighty-five percent period of parole ineligibility and a three-year period of parole supervision under NERA for the burglary conviction, a fifteen-year term for the witness-tampering conviction, and an eighteen-month term for the stalking conviction. The court imposed an eight-year term with a four-year period of parole ineligibility for the desecration conviction, a four-year term for the hindering-prosecution

A-3454-22

conviction, eight-year terms for each of the endangering convictions, and a four-year term on the unlawful-possession conviction.

In determining whether to impose consecutive sentences for the remaining convictions, the court analyzed factors set forth in State v. Yarbough, 100 N.J. 627, 643-44 (1985). The court viewed defendant's conduct as having resulted in "separate crimes with separate objectives," occurring in different locations and on different days and involving different victims. The court specifically referenced Vega's murder, defendant's efforts to conceal her body, and his actions before her murder, including the May 5 assault and sexual assault of Vega while the children were at home.

The court ordered the prison terms on the murder, burglary, and witness-tampering convictions to run consecutive to the terms imposed on the aggravated-assault, sexual-assault, and first theft convictions. The court ordered the prison term on the desecration and hindering-prosecution convictions to run consecutive to the terms on the aggravated-assault, sexual-assault, first theft, murder, burglary, witness-tampering, and stalking convictions. The court ordered the prison terms on the endangering convictions to run consecutive to the terms on the aggravated-assault, sexual-assault, first theft, murder, burglary, witness-tampering, stalking, desecration, and hindering-prosecution convictions. The court ordered the prison term on

15

the second theft conviction to run consecutive to the terms imposed on the aggravated-assault, sexual-assault, and first theft convictions. The court ran the remaining sentences concurrently.

The court considered the fairness of the sentence and concluded "that under all of the circumstances," the sentence was "fair and appropriate . . . considering the sheer brutality and heinousness of the crime."

## II.

Defendant makes the following arguments on appeal:

POINT I

> THE TRIAL COURT ERRED BY ADMITTING EVERY HEARSAY STATEMENT MADE BY THE VICTIM IN ANY FORMAT UNDER THE FORFEITURE [-] BY [-] WRONGDOING EXCEPTION WITHOUT MAKING ANY RELIABILITY FINDINGS.
>
> > i. THE COURT ERRED BY FINDING THAT THE VICTIM WAS KILLED FOR THE PURPOSE OF PROCURING HER UNAVAILABILITY.
> >
> > ii. THE COURT ERRED BY ADMITTING ALL OF THE VICTIM'S HEARSAY STATEMENTS, IN ANY FORMAT, WITHOUT MAKING ANY RELIABILITY FINDINGS.
> >
> > iii. THE COURT ERRED BY HOLDING THE STATE TO A LOWER BURDEN OF PROOF BECAUSE DEFENDANT

16

WAS CHARGED WITH DOMESTIC VIOLENCE OFFENSES.

iv. THE COURT'S ERRONEOUS RULING DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL, REQUIRING REVERSAL.

POINT II

THE TRIAL COURT ERRED BY REFUSING TO CHARGE THE JURY ON PASSION/PROVOCATION AS A LESSER-INCLUDED OFFENSE OF MURDER.

POINT III

A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE TRIAL COURT IMPROPERLY FOUND AGGRAVATING FACTOR ONE BY DOUBLE-COUNTING ELEMENTS OF THE OFFENSES, FAILED TO FIND MITIGATING FACTOR SEVEN, AND FAILED TO GIVE AN EXPLICIT STATEMENT EXPLAINING THE OVERALL FAIRNESS OF THE SENTENCE.

Because we are unpersuaded by the arguments, we affirm.

A.

We first consider the court's admission of Vega's statements under the forfeiture-by-wrongdoing exception to the hearsay rule. "We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). "We will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in

judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). We "defer to a trial court's factual findings 'when supported by adequate, substantial, credible evidence.'" C.R. v. M.T., 257 N.J. 126, 139 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). We review an evidentiary decision de novo if the trial court applied the wrong legal standard in admitting or excluding the evidence. State v. Trinidad, 241 N.J. 425, 448 (2020). We are mindful that not "[e]very mistaken evidentiary ruling" requires "reversal of a conviction. Only those that have the clear capacity to cause an unjust result" will lead us to reverse. Garcia, 245 N.J. at 430.

N.J.R.E. 804(b)(9) provides that "[a] statement offered against a party who has engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not "excluded by the hearsay rule if the declarant is unavailable as a witness." The forfeiture-by-wrongdoing exception "extinguishes a defendant's confrontation rights to keep a hearsay statement from the jury [only] when the defendant has procured the unavailability of a witness through his wrongful conduct." State v. Cabbell, 207 N.J. 311, 335 (2011). "[T]he admission of evidence under the forfeiture-by-wrongdoing [exception] does not offend the Sixth Amendment to the United States Constitution" because "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." State

v. Byrd, 198 N.J. 319, 339-40 (2009) (quoting Davis v. Washington, 547 U.S. 813, 833 (2006)); see also Cabbell, 207 N.J. at 328 (referencing the right to confrontation set forth in our federal constitution, U.S. Const. amend. VI, and state constitution, N.J. Const. art. I, ¶ 10). The exception "achieve[s] three important policy objectives": "ensur[ing] that a criminal defendant will not profit from making a witness unavailable to testify," "provid[ing] a powerful disincentive against witness intimidation," and "further[ing] one of the primary goals of every trial—the search for truth." Byrd, 198 N.J. at 324-25.

For the admission of a witness's out-of-court statement under the forfeiture-by-wrongdoing exception, the State must prove "by a preponderance of the evidence that defendant engaged, directly or indirectly, in wrongdoing that was intended to, and did, procure the witness's unavailability." Id. at 352; see also State v. Rinker, 446 N.J. Super. 347, 360 (App. Div. 2016) (same). A witness is "unavailable if the witness cannot be located, has been rendered unable to testify because of the infliction of physical or psychological injuries, or has been killed as a result of the wrongful conduct of the defendant." Byrd, 198 N.J. at 352.

Before admitting an out-of-court statement under the forfeiture-by-wrongdoing exception, "the court must determine that the statement bears some indicia of reliability." Ibid.

[A] prior statement that "(A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (B) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in a deposition," N.J.R.E. 803(a)(1), . . . is admissible "as substantive evidence provided its reliability has been established by a preponderance of the evidence in light of all surrounding relevant circumstances," State v. Gross, 121 N.J. 18, 29 (1990).

[Id. at 352-53.]

However,

[t]o allow for some flexibility to the wide range of scenarios that may involve a defendant using unlawful means to render a witness unavailable, in limited circumstances, an out-of-court statement may be admissible, even if not contained in a recording or writing, or if not given under oath, so long as the State demonstrates that the statement has compelling indicia of trustworthiness.

[Id. at 353.]

Defendant argues the trial court erred in finding defendant had murdered Vega for the purpose of rendering her unavailable to testify. Defendant faults the court for purportedly "ignor[ing]" evidence defendant "was either provoked to kill[] Vega during a violent conflict or killed her out of jealousy." The record is devoid of any evidence supporting defendant's contention Vega provoked him into killing her. In contrast, the court's determination defendant had acted with intent to render Vega unavailable as a witness is supported by

20

substantial, competent, credible evidence in the record, including his cousin's testimony about the statements and admissions defendant made to him, the neighbor's observations, and defendant's overheard threat to kill Vega if she did not withdraw the charges against him.

That defendant's jealousy may have played a role in his murderous and assaultive conduct towards Vega does not render inapplicable the forfeiture-by-wrongdoing exception.  Nothing in the language of N.J.R.E. 804(b)(9) requires the State to prove that the intent to render a witness unavailable was the <u>sole</u> reason a defendant caused the witness's unavailability.  <u>See</u> <u>State in the Int. of J.A.</u>, 195 N.J. 324, 338 (2008) (finding "[w]e interpret an evidence rule, as we would a statute, by first looking at its plain language").

Defendant has not cited any case law to support his construction of the rule.  Rather, courts that have addressed this issue have soundly rejected contentions that the prevention of testimony must be a defendant's sole motivation in rendering a witness unavailable.  <u>See, e.g.</u>, <u>United States v. Houlihan</u>, 92 F.3d 1271, 1279 (1st Cir. 1996) ("Moreover, it is sufficient in this regard to show that the evildoer was motivated <u>in part</u> by a desire to silence the witness; the intent to deprive the prosecution of testimony need not be the actor's <u>sole</u> motivation."); <u>United States v. Roberts</u>, 84 F.4th 659, 667-68 (6th Cir. 2023) (finding even if defendant had "multiple motives," his

<div align="center">21</div>

"desire, at least in part, to prevent [a witness] from testifying" is "enough for the [forfeiture-by-wrongdoing] exception to apply," noting that "no circuit has held that having multiple motives for preventing someone from testifying precludes application of the forfeiture-by-wrongdoing exception"); United States v. El Shafee Elsheikh, 103 F.4th 1006, 1024 (4th Cir. 2024) (applying forfeiture-by-wrongdoing exception "even when a defendant has multiple motivations for harming a witness" (quoting United States v. Jackson, 706 F.3d 264, 269 (4th Cir. 2013))); United States v. Cazares, 788 F.3d 956, 975 (9th Cir. 2015) ("The government is not required to show that a defendant's sole purpose was to silence the declarant."); United States v. Rudolph, 152 F.4th 1197, 1230 (10th Cir. 2025) ("[P]rocuring a witness's unavailability need only partly motivate the defendant."); United States v. Martinez, 476 F.3d 961, 966 (D.C. Cir. 2007) (finding intent to murder witness "both to exact revenge and to prevent" witness's testimony supports application of forfeiture-by-wrongdoing exception).  Indeed, accepting defendant's argument

> would play roulette with the safety of cooperating witnesses, who often face immense stress and danger when testifying against co-conspirators and other criminal defendants.  Armed with multiple motives for their actions, defendants might be tempted to murder, injure, or intimidate witnesses before trial and then invoke their constitutional right to confrontation to ensure that those witnesses' statements are never heard in court.  Such an outcome would be fundamentally at

22

odds with the axiom that "no one should be permitted to take advantage of his wrong[.]"

[Jackson, 706 F.3d at 269 (quoting Giles v. California, 554 U.S. 353, 366 (2008)).]

We are equally unpersuaded by defendant's contention the court held the State to a lower burden of proof due to defendant's domestic-violence offenses. In both its oral and written decisions, the court expressly recognized the State had to prove forfeiture by wrongdoing by a preponderance of the evidence. We do not view the court's citation to the majority opinion in Giles, 554 U.S. at 376-77, and Justice Souter's concurrence in that case, id. at 380, as evidence of a diminished application of that standard. See Giles, 554 U.S. at 377 (finding when an "abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution . . . ."). Moreover, the court's finding of intent was supported by other substantial, credible evidence in the record and not only evidence of defendant's acts of domestic violence.

The court erred in not setting forth on the record its findings regarding the reliability or trustworthiness of Vega's statements, as required by Byrd, 198 N.J. at 352-53. However, that error does not end our analysis. When a "trial court fails to apply the proper test in analyzing the admissibility of

proffered evidence," the appellate court reviews the evidence de novo. Rinker, 446 N.J. Super. at 358. Having conducted a de novo review, we conclude the admitted statements have a sufficient "indicia of reliability" for admission. Byrd, 198 N.J. at 352.

Defendant did not challenge in the trial court and does not challenge in this court the reliability of Vega's recorded statement. At the end of her statement, a detective asked Vega: "do you swear or affirm that everything you stated today was true?" She responded, "It's true." Contained in a "sound recording . . . made . . . by the witness" and sworn by her to be true, Vega's recorded statement was given "in circumstances establishing its reliability" and, therefore, was properly admitted. Ibid. (quoting N.J.R.E. 803(a)(1)(A)).

The statements Vega made in her text and Facebook messages were contained "in a writing made . . . by the witness . . . ." Ibid. (quoting N.J.R.E. 803(a)(1)(A)). A cyber-forensics analyst testified at trial about data extracted from Vega's cell phone. Except for defendant, the people who had received Vega's written messages and heard Vega make the oral statements at issue also testified at trial. Vega sent the messages and made the statements at or near the time of the events she described. The information contained in Vega's messages and oral statements was consistent with the information Vega provided in the recorded statement she gave to the police and with the personal

24

A-3454-22

observations made by the witnesses. "[I]n light of all of the surrounding circumstances," Vega's written statements were supported by a sufficient indicia of "'reliability'" and her oral statements by a "compelling indicia of trustworthiness" to warrant their admission under N.J.R.E. 804(b)(9). Byrd, 198 N.J. at 352-53 (emphasis omitted) (quoting N.J.R.E. 803(a)(1)).

But even if the court had erred in admitting her statements, the error would be harmless given the overwhelming evidence of defendant's guilt. "[T]o warrant reversal of defendant's conviction, . . . errors, singly or collectively, must 'raise a reasonable doubt' as to whether they affected the result reached by the jury." State v. Prall, 231 N.J. 567, 588 (2018) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). "The error[s] must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)). Defendant's guilt was supported by the testimony of numerous witnesses, multiple surveillance videos, photographs, DNA and blood analysis, and evidence regarding defendant's cell-phone activity. Even absent Vega's statements, the State's case was strong and compelling.

For all of those reasons, we reject defendant's challenge to the admission of Vega's statements under N.J.R.E. 804(b)(9).

B.

25

We now turn to defendant's argument that the court erred by refusing to charge the jury on passion/provocation as a lesser-included offense of murder.

"Proper jury charges are essential to a fair trial." State v. Bragg, 260 N.J. 387, 405 (2025). A "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). Erroneous charges on fundamental issues are presumed to constitute reversible error. State v. Carrero, 229 N.J. 118, 127 (2017).

"A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." State v. Funderburg, 225 N.J. 66, 80 (2016). "However, some of the trial court's decisions, such as the charging of lesser-included offenses, are governed by statute." Id. at 81. N.J.S.A. 2C:1-8(e) provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Thus, when reviewing a trial court's decision to deny a defendant's request for "a specific instruction," we "consider whether a rational basis for giving the instruction existed." State v. A.L.A., 251 N.J. 580, 595 (2022).

Under the rational-basis test, we "determin[e] whether 'the evidence presents a rational basis on which the jury could (1) acquit the defendant of the greater charge and (2) convict the defendant of the lesser.'" Carrero, 229 N.J. at 128 (quoting State v. Brent, 137 N.J. 107, 117 (1994)). To make that determination, we, like the trial court, must "examine the record thoroughly to determine if the rational-basis standard has been satisfied." State v. Crisantos, 102 N.J. 265, 278 (1986); see also State v. Canfield, 252 N.J. 497, 501 (2023) (same). In deciding whether the test has been satisfied, we view "the evidence in the light most favorable to the defendant" if the defendant requested "a lesser-included offense charge at trial, including passion/provocation manslaughter." State v. Owens, 262 N.J. 391, 392 (2026). "If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error." Carrero, 229 N.J. at 128.

"Passion/provocation manslaughter is an intentional homicide committed under extenuating circumstances that mitigate the murder." State v. Robinson, 136 N.J. 476, 481 (1994); see also Galicia, 210 N.J. at 378-79 (finding passion/provocation manslaughter applicable "when a homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3 . . . is 'committed in the heat of passion resulting from a reasonable provocation'" (quoting N.J.S.A. 2C:11-4(b)(2))). Passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), has four

27

elements: (1) adequate provocation; (2) insufficient time for the defendant to cool off between the provocation and the killing; (3) the defendant was actually impassioned by the provocation; and (4) the defendant had not cooled off before the killing. Carrero, 229 N.J. at 129.

"The first two elements are assessed objectively, while the third and fourth are 'more subjective because they relate to the defendant's actual response.'" Ibid. (quoting Robinson, 136 N.J. at 490). Thus, "[t]o warrant the passion/provocation jury charge, the evidence must rationally support only the first two elements; the subjective elements 'should usually be left to the jury to determine.'" Ibid. (quoting State v. Mauricio, 117 N.J. 402, 413 (1990)); see also Crisantos, 102 N.J. at 275 ("Because the issue of passion/provocation can arise in an infinite number of factual settings, mitigation of homicide because of passion/provocation is ordinarily a question for the jury, unless the evidence is so weak as to preclude jury consideration.").

"In considering the first criterion, whether the provocation was adequate, the judge must determine whether a reasonable fact-finder could conclude that the loss of self-control was a reasonable reaction." State v. Viera, 346 N.J. Super. 198, 212 (App. Div. 2001). For provocation to be reasonable enough to support a manslaughter conviction, it must be "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control." Carrero,

A-3454-22

229 N.J. at 129 (alterations in original) (quoting Mauricio, 117 N.J. at 412). As for the second element, no per se time period to cool off is required; instead, there must be a showing of insufficient time for "a reasonable person in the defendant's position" to cool off before killing the victim. Id. at 129-30; see also Viera, 346 N.J. Super. at 213 (same).

"Words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter." State v. Jumpp, 261 N.J. Super. 514, 522 (App. Div. 1993); see also Carrero, 229 N.J. at 129. "Likewise, sexual rejection by a paramour does not constitute adequate provocation," Jumpp, 261 N.J. Super. at 522, nor does "conduct that is alleged to have been sexually frustrating," Mauricio, 117 N.J. at 414. See also State v. Docaj, 407 N.J. Super. 352, 368 (App. Div. 2009) (finding wife's "statements that she wanted a divorce and had 'another man lined up'" were insufficient to warrant passion/provocation charge); State v. Abrams, 256 N.J. Super. 390, 395-98 (App. Div. 1992) (finding court properly denied passion/provocation charge because there was "no basis in the evidence" that defendant had adequate provocation to kill woman's paramour because she was having sexual relations with the paramour and being unfaithful to defendant); McClain, 248 N.J. Super. at 419 (finding "evidence that defendant was sexually rejected,

29

teased or repulsed by a paramour is insufficient to constitute adequate provocation").

Further, the law is clear that "the defendant's response must be proportionate to the provocation." Docaj, 407 N.J. Super. at 369. "[I]f a defendant on a slight provocation attacked the victim with violence out of proportion to the provocation, the crime is murder." Darrian, 255 N.J. Super. at 449. Thus, our Supreme Court has rejected a claim "that a single blow by an unarmed woman could have aroused the passions of an ordinary man beyond the power of his control" is sufficient to justify a passion/provocation manslaughter charge. State v. Oglesby, 122 N.J. 522, 536 (1991); see also Darrian, 255 N.J. Super. at 451 (holding that being struck by "an unarmed woman who was only 5'2½" tall and weighed 125 pounds could not have aroused the passions of an ordinary man beyond the power of his control").

To support his passion/provocation argument, defendant relies on: testimony by defendant's cousin; Vega's statement to police that on May 5, she threw a doorknob at defendant after he had locked the front door of the apartment and pushed her when she was able to open the door; and a detective's description of the living room as looking like "there must have been some form of a violent or aggressive type struggle." Viewing that evidence in

30                                                                    A-3454-22

the light most favorable to defendant, there is no support for a charge on passion/provocation manslaughter.

Defendant specifically relies on the cousin's testimony that he had seen Vega throw a cup at defendant and spit at him and that he "[a]ll the time" had witnessed "similar acts" between Vega and defendant in which Vega "may have been the aggressor." The alleged cup-throwing and spitting incident took place in the summer of 2017. The last time the cousin saw Vega was on January 1, 2018. Thus, any interaction between Vega and defendant that the cousin witnessed had taken place before then, months if not years before her murder, providing sufficient time for "a reasonable person in the defendant's position" to cool off before killing the victim. Carrero, 229 N.J. at 129-30.

Defendant also relies on this testimony by the cousin:

> Q. When [defendant] came to see you on Thursday about the Crown Vic[toria], why did he need a new car? Why did he need to borrow your Crown Vic[toria], rather?
>
> A. Um, I offered to lend him my car. Uh, he got into an argument with his kids' mother. Um, then she became the domestic, you know, uh, from my understanding she put her hands on him. So --
>
> Q. No, I'm sorry. I didn't ask you that. What I asked you was, why did you lend him the car?
>
> A. He had a warrant out for his arrest.

31

Defendant contends in his merits brief the cousin was referencing the events that lead to her death on May 9. In the full context of the cousin's testimony, it appears the cousin was referencing the May 5 domestic-violence incident when he said it was his "understanding" Vega had "put her hands" on defendant. Even accepting defendant's assertion, the cousin's testimony does not support a charge for passion/provocation manslaughter.

The cousin was not present and did not witness the events of May 5 and May 9. In his testimony, he did not identify the basis of his "understanding" about what had occurred. Even if he had seen Vega "put her hands" on defendant on May 9, that testimony would not support the requested charge. Defendant was at least a foot taller and 100 pounds heavier than Vega. See Viera, 346 N.J. Super. at 215-16 (finding that "although mutual combat under certain circumstances may constitute adequate provocation and reduce murder to manslaughter, the contest must be waged on equal terms"). The record is devoid of any evidence Vega was armed. Cf. State v. Blanks, 313 N.J. Super. 55, 72 (App. Div. 1998) ("long-handled cooking fork was found on the kitchen floor at the victim's side"). Under those circumstances, an unarmed woman who put her hands on a much larger man "could not have aroused the passions of an ordinary man beyond the power of his control." Darrian, 255 N.J. Super. at 451; see also Oglesby, 122 N.J. at 536 (finding evidence of "a single blow

by an unarmed woman" was insufficient to justify a passion/provocation manslaughter charge).

The charge likewise is not supported by the remaining evidence defendant cited. Vega's statement about throwing the doorknob was about an incident that took place several days before her May 9 murder. Moreover, it does not support a factual finding that she was the aggressor given that defendant had locked her out of the apartment and pushed her as she entered it. The detective's testimony about the state of the living room demonstrated only that there had been "some form of a violent or aggressive type struggle" in the apartment. It was devoid of any indication Vega had caused or provoked the struggle. Cf. Blanks, 313 N.J. Super. at 72 (finding passion/provocation manslaughter charge was appropriate when victim may have provoked the defendant by brandishing a long-handled fork, which was found at her side).

With no rational basis for a passion/provocation manslaughter charge in this case, the court correctly declined to give that instruction to the jury.

C.

Finally, we address defendant's sentencing arguments. We review a trial court's sentencing decision under an abuse-of-discretion standard. State v. Konecny, 250 N.J. 321, 334 (2022). We do not substitute our "judgment for that of the sentencing court." State v. Liepe, 239 N.J. 359, 370 (2019). We

apply that deferential standard as long as the sentencing court "follow[ed] the Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014); see also Trinidad, 241 N.J. at 453.

Thus, we affirm a sentence "unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found were not 'based upon competent credible evidence in the record'; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Rivera, 249 N.J. 285, 297-98 (2021) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). "The test is not whether a reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008) (quoting State v. Tarver, 272 N.J. Super. 414, 435 (App. Div. 1994)).

Defendant argues the trial court erred in finding aggravating factor one by "double-counting" elements of his offenses without sufficient support in the record given the "single blunt force trauma injury" found by the forensic

pathologist;[2] failing to find mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) ("defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense"); and failing to give a statement explaining the fairness of the sentence pursuant to State v. Torres, 246 N.J. 246, 268 (2021).  Perceiving no abuse of discretion or misapplication of the law by the court in the sentence it imposed, we affirm.

"Elements of a crime, including those that establish its grade, may not be used as aggravating factors for sentencing of that particular crime."  State v. Lawless, 214 N.J. 594, 608 (2013).  However, "courts do 'not engage in double-counting when [they] consider[] facts showing defendant did more than the minimum the State is required to prove to establish the elements of an offense.'"  State v. R.A.M., 482 N.J. Super. 439, 459 (App. Div. 2025) (alterations in original) (quoting State v. A.T.C., 454 N.J. Super. 235, 254-55 (App. Div. 2018), aff'd in part on other grounds, 239 N.J. 450 (2019)).

In considering aggravating factor one, the court expressly acknowledged that "a sentencing court must scrupulously avoid double counting facts that established the elements of the relevant offense," citing State v. Fuentes, 217

____

[2]  The forensic pathologist did not testify that the vertical fracture to Vega's jaw was the only injury she suffered; he testified her broken jaw was the only injury he could detect given the decomposed state of her body.

N.J. 57 (2014). The court found defendant had treated Vega in a "heinous and atrocious way . . . before, during, and after her murder" and that the evidence had "clearly demonstrated that [defendant] terrorized this young woman and . . . psychologically tortured her for weeks, leading up to her demise." The court referenced the surveillance video that showed defendant "chasing [Vega] and tackling her outside her apartment as she tried to run away after she had been strangled and sexually assaulted by [defendant]" and defendant "tr[ying] to drag her back into the apartment." The court noted that, after he killed their mother, defendant had made no provision for his children to be picked up from school and then told them a devastating lie when he said their mother "had abandoned them and ran off with another man." Referencing the autopsy photographs, testimony about the condition of Vega's decomposing body, and defendant's efforts to cover up the murder and enlist his brother's assistance in doing so, the court found defendant's "actions towards the planning, the preparation, and ultimate destruction of Ms. Vega's remains were about as heinous as this [c]ourt has ever seen" in its thirteen years on the bench. Thus, given defendant's "over the top conduct," the court applied aggravating factor one.

In doing so, the court viewed the entirety of defendant's actions, considering facts "showing defendant did more than the minimum the State

A-3454-22

[wa]s required to prove." R.A.M., 482 N.J. Super. at 459 (quoting A.T.C., 454 N.J. Super. at 255). The court did not engage in improper double-counting, and its findings regarding the cruelty of defendant's conduct were "fully grounded in the record before the . . . court." Fuentes, 217 N.J. at 77. Thus, the court did not abuse its discretion in finding aggravating factor one. See State v. McGuire, 419 N.J. Super. 88, 159-60 (App. Div. 2011) (in a case in which defendant was convicted of murdering her husband, desecrating his body, and other crimes, Appellate Division found no abuse of discretion in application of aggravating factor one given trial court's findings concerning how defendant had placed the victim's body in garbage bags and left it to decompose without being identified, portrayed the victim in a negative light, and demonstrated "callous disregard for the life of a human being and for the welfare of defendant's own children").

Defendant argues on appeal the court should have applied mitigating factor seven. During the sentencing hearing, defendant did not ask the court to consider that mitigating factor. Even if he had, the record does not support it. The presentence report indicated defendant had one juvenile adjudication in 1999 for possession of a weapon for an unlawful purpose. As an adult, defendant pleaded guilty in 2008 to receiving stolen property and was convicted in 2011 of resisting arrest. On that record, we perceive no abuse of

37

discretion in the court's decision not to apply mitigating factor seven. Moreover, defendant does not contend, and we see no basis to conclude, the aggravating factors found by the court would have been outweighed by mitigating factor seven.

We also reject defendant's contention the court failed to "explicit[ly] . . . explain[]" the sentence's "overall fairness." Torres, 246 N.J. at 268. The court undertook a comprehensive analysis of the Yarbough factors and made an express finding of fairness of the overall sentence, stating "[t]his [c]ourt believes that under all of the circumstances," which the court had detailed, "this is a fair and appropriate sentence considering the sheer brutality and heinousness of the crime." On this record, we perceive no failure to comply with Torres or abuse of discretion in the sentence imposed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division